944 A.2d 525

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Charles ZUCKERMAN.**

**Misc. Docket AG No. 7 Sept. Term, 2007.**

Court of Appeals of Maryland.

March 17, 2008.

Fletcher P. Thompson, Asst. Bar Counsel (Melvin Hirsnman, Bar Counsel, Atty. Grievance Com'n of MD), for Petitioner.

M. Gordon Tayback, Baltimore, for Respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, JJ., ALAN M. WILNER and DALE R. CATHELL, JJ. (retired, specially assigned).

DALE R. CATHELL Judge (retired, specially assigned).

Pursuant to Maryland Rule 16–751,[1] the Attorney Grievance Commission (the "Commission" or "Bar Counsel"), acting through Bar Counsel, filed a petition for disciplinary action or remedial action against Charles Zuckerman ("respondent") on April 26, 2007. He is charged with professional misconduct, as defined by Maryland Rule 16–701(i),[2] through violations of the Maryland Rules of Professional Conduct ("MRPC"), specifically, Rule 1.1 (Competence),[3] 1.3 (Diligence),[4] 1.15(d) (Safekeeping Property),[5] 5.3 (Responsibilities Regarding Nonlawyer

---

**1.** Maryland Rule 16–751 provides, in relevant part: "(a) **Commencement of disciplinary or remedial action.** (1) Upon approval of Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

**2.** Maryland Rule 16–701(i) provides: " 'Professional misconduct' or 'misconduct' has the meaning set forth in Rule 8.4 of the Maryland Lawyers' Rules of Professional Conduct . . . ."

**3.** Rule 1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

**4.** Rule 1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client."

**5.** Rule 1.15(d) provides:
"Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the

Assistants),[6] and 8.4(d) (Misconduct).[7] He is additionally charged with violating Maryland Code (1989, 2004 Repl. Vol.), § 10–306 of the Business Occupations and Professions Article ("BOP").[8]

Pursuant to Maryland Rule 16–752(a),[9] we referred the matter to Judge John N. Prevas, of the Circuit Court for Baltimore City, for an evidentiary hearing and to make findings of fact and conclusions of law in accordance with Mary-

---

client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."

6. Rule 5.3 provides, in relevant part:

"With respect to a nonlawyer employed or retained by or associated with a lawyer:
"(a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

. . .

"(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Maryland Lawyers' Rules of Professional Conduct if engaged in by a lawyer if:
"(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
"(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action. . . . ''

7. Rule 8.4 provides, in relevant part: "It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice. . . .''

8. Section 10–306 of the Business Occupations and Professions Article provides: "A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

9. Maryland Rule 16–752(a) states, in relevant part: "(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. . . .''

land Rule 16–757(c).[10]   On September 10, 2007, Judge Prevas held a hearing and, on October 24, 2007, issued findings of fact and conclusions of law, in which he found by clear and convincing evidence that respondent had violated MRPC 1.1, 1.3, 1.15(d), 8.4(d) and Md. BOP, § 10–306.   Neither respondent nor petitioner filed exceptions to these findings.   The Hearing Judge's findings of fact and conclusions of law are as follows:

"The respondent has been a member of the Maryland Bar since June 20, 1974.   He served for about five and a half years as an Assistant State's Attorney in Baltimore City and as an Assistant Attorney General assigned to the Public Service Commission for about a year and a half.   For the last twenty-four years the respondent has conducted a private law office in Baltimore City. His cases consisted of a high volume of small personal injury cases (settlements averaging under $10,000) and few family law and criminal cases as well.

"This is the second instance in which such a violation has taken place.   During the September Term of 2004, the Maryland Court of Appeals held that respondent violated Maryland Rules of Profession Conduct 1.1, 1.3, 1.4(a), 1.15(a), 5.3(a) and (b), 8.4(d), BOP [Business Occupations and Professions Article of the Maryland Code] § 10–306, and § 10–307, and Maryland Rules 16–604 and 16–607. *Attorney Grievance Commission v. Zuckerman,* [386 Md. 341,] 872 A.2d 693 (Md.2005).   This decision arose from events that transpired beginning in the spring of 2002 onward.

"In April of 2005, the respondent was suspended indefinitely for these violations.   The Court of Appeals found the respondent violated Maryland Rules of Professional Conduct 1.1, 1.3, 1.4(a), 1.15(a), 5.3(a) and (b), 8.4(d), Business

---

**10.**   Maryland Rule 16–757(c) provides in relevant part: "The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law...."

Occupations and Professions Article § 10–304 and § 10–306 and Maryland Rules 16–607. *Id.* After respondent was suspended, he was given the right to apply for reinstatement within thirty days. Respondent subsequently applied for reinstatement and was reinstated on June 2, 2005.

## "I. Rule 5.3(a) and (b) (Responsibilities Regarding NonLawyer Assistants).

### "A. Findings of Fact

"In May of 2002, respondent hired a new employee, Shannon Becker, as an office assistant. Within a couple days of hiring her, respondent gave Ms. Becker signatory authority over his trust account. Shortly after she was hired, Ms. Becker devised a scheme to steal money from respondent's trust account by writing checks to friends who would then cash them for her and give her the money while concealing her actions by creating fictitious check stubs. In less than two months, she was able to steal approximately $144,000 from respondent's trust account.

"During Bar Counsel's investigation of the initial matter, respondent explained that he had allowed this money to accumulate in his trust account over a period of years because he was not paying medical providers in personal injury settlement cases. He retained the money because he thought that the clients' personal injury protection policy would pay the money. However, he never followed up to see if that had occurred. The result was that he paid restitution of approximately $144,000 to various medical providers and clients over a two-year period. When Bar Counsel reviewed respondent's trust account in that investigation, Bar Counsel's office learned that respondent had routinely failed to deposit personal injury settlement checks in a timely fashion, although he disbursed funds in the settlements on a timely basis. On one occasion his trust account had a negative balance as a result of respondent's practice of advancing payments that he had not deposited in his trust account. Respondent learned of Ms. Becker's

thefts when he received an anonymous telephone call in the middle of July, 2002....

"Respondent subsequently brought in another employee, Ms. Rhonda Elkins, in an attempt to straighten out the fraud committed by Ms. Becker. Ms. Elkins was a certified paralegal that had obtained her paralegal degree from Baltimore County Community College, Dundalk Campus. Upon recommendation of Baltimore County Community College, Ms. Elkins was brought into the respondent's office to replace Ms. Becker, originally as an unpaid intern, where she assisted Ms. Kohler, another paralegal on PIP claims....

"In 2002, when an opening became available for a paralegal position, Ms. Elkins was offered the position and accepted it. Ms. Elkins had a prior felony theft conviction, which Mr. Zuckerman claimed to be unaware of. Out of the five days a week Ms. Elkins worked, she would spend approximately one to two days dealing with the prior theft by Ms. Becker and three to four on her other duties. During the course of her employment, Ms. Elkins was able to steal approximately $124,000 from the respondent's trust account.

"It became Ms. Elkins' job to manage the day-to-day operations of respondent's trust account.... Ms. Elkins devised a scheme in March of 2003 to steal funds respondent was placing in his trust account to repay the individuals whose funds Ms. Becker had stolen. After she had written out checks and respondent had signed the checks, she or her husband forged the payee's endorsement and her husband cashed the check after placing his endorsement on it.... Respondent did not detect this theft because he never looked at the backs of the checks to see if the payee had endorsed them.... When Ms. Elkins stopped stealing money from the clients whom respondent was attempting to repay, she started stealing from respondent's trust account by making out checks to the estate of James Hilling, for which she had been personal representative, Anthony Elkins, her husband, or herself.... In January, 2006, respondent learned that Ms. Elkins had taken out a credit card in

his name.... When he spoke to her about it, she admitted that she had done so.

"Respondent told her that she could work through the rest of the pay period.... A few days later, Ms. Elkins admitted that she had been stealing from respondent's trust account. Respondent immediately terminated her employment.... Respondent then reviewed his trust account and found out about the forgeries and checks she had written to herself, her husband, and the estate.... Respondent concluded that he had not detected the checks that Ms. Elkins had made out to herself or somebody associated with her because she had removed them from the statements.... On March 21, 2006, respondent, through counsel, reported Ms. Elkins' thefts from [his] trust account to Bar Counsel.... Respondent calculated the total amount of the thefts to be $124,041.20.... Of this amount, $16,804.54 were client funds, $69,118.43 were respondent's fees and approximately $38,000 was for medical providers.... John DeBone, petitioner's trust account paralegal, calculated that $43,262.13 belonged to clients from whom Shannon Becker had also stolen....

"**B. Conclusions of Law**

"Respondent violated Rules 5.3(a) and 5.3(b). Maryland Rule of Profession Conduct 5.3(a) provides that 'a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the profession obligations of the lawyer.' Rule 5.3(b) provides that 'a lawyer having direct supervisory authority over the non-lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer.'

"Respondent violated Rule 5.3(a) by failing to have in place procedures to ensure Ms. Elkins' compliance with the Rules of Professional Conduct and Rule 5.3(b) by failing to supervise her activities. The fact that he continued the practice of failing to disburse funds promptly shows that he did not put into place any system to make sure that funds

were promptly disbursed. It was this failure, which allowed Shannon Becker to steal over $140,000 from his trust account.

"Respondent cannot claim that Ms. Elkins' theft of checks made out to clients led him to believe that he had disbursed funds when he really had not. Petitioner's exhibit 14 shows that only three of the checks Ms. Elkins stole can be connected with clients who had funds in his trust account at the time of the theft. The remaining positive balances would have been discovered had respondent conducted a proper reconciliation of his account even if he had not detected the forged endorsements. The total of positive balances which cannot be directly connected to any check written by Ms. Elkins is $104,811.37. The continuation of the practice of advancing funds, while it occurred on a much smaller scale than in the time period before Shannon Becker, also shows that respondent did not have proper procedures in place to safeguard client funds as required by Rule 1.15(a). Likewise, it is clear that respondent did not supervise Ms. Elkins adequately. She initially was able to accomplish her thefts by forging endorsements which respondent did not detect because he did not look at the back of the checks. She then became bolder and stole by making out checks to herself, an estate, and her husband. These checks were in round numbers and could not possibly have been related to any case under respondent's care.... They would have been detected had respondent observed that the checks were removed. He made the same mistake with Rhonda Elkins that he did with Shannon Becker. Many of these thefts were in the latter half of 2005 after he had returned from his suspension.

### "II. Violation of Md. Bus. Occ. & Prof. Code Ann. § 10–306 (Advance Payments)

### "A. Findings of Fact

"Over the course of almost three and a half years, between July, 2002 and November 2005, there were sixteen instances in which the respondent advanced client funds

from his trust account before corresponding deposits were placed in his trust account. Of those sixteen instances, however, five of them were as a result of the bank cashing post-dated checks and not the fault of respondent. Looking to petitioner's exhibit 13, the list is as follows.

"On July 29, 2002, a check payable to Marcus Baskerville in the amount of $653.75 was cashed against respondent's trust account. On July 30, 2002, respondent deposited $1,250.00 into his trust account in connection with the settlement of Marcus Baskerville's case. This was the first deposit respondent made into his trust account in connection with this [Baskerville] case.

"On July 29, 2002, a check payable [to] Willie Parrine in the amount of $1,403.00 was cashed against respondent's trust account. On July 30, 2002, respondent deposited $2,500.00 into his trust account in connection with the settlement of Willie Parrine's case. This was the first deposit respondent made into his trust account in connection with this [Parrine] case.

"On October 15, 2002, a check payable to Arthur Brockington in the amount of $3,675.00 was cashed against respondent's trust account. On October 17, 2002, respondent deposited $5,700.00 into his trust account in connection with the settlement of Arthur Brockington's case. This was the first deposit respondent made into his trust account in connection with this [Brockington] case. In this instance, the bank cashed a post-dated check.

"On October 22, 2002, respondent wrote a check from his trust account payable to Tashia Smith in the amount of $1,655.00. On October 23, 2002, respondent deposited $5,000.00 into his trust account in connection with the settlement of Tashia Smith's case. This was the first deposit respondent made into his trust account in connection with this [Smith] case.

"On November 5, 2002, respondent wrote a check from his trust account payable to Judith McCoy in the amount of $624.05. On November 6, 2002, respondent deposited $2,546.18 into his trust account in connection with the

settlement of Judith McCoy's case. This was the first deposit respondent made into his trust account in connection with this [McCoy] case.

"On November 19, 2002, respondent wrote a check from his trust account payable to Gloria Lawson in the amount of $1,816.40. On November 20, 2002, respondent deposited $6,000.00 into his trust account in connection with the settlement of Gloria Lawson's case. This was the first deposit respondent made into his trust account in connection with this [Lawson] case.

"On November 21, 2002, respondent wrote a check from his trust account payable to Taimika Hugley in the amount of $266.67. On November 25, 2002, respondent deposited $400.00 into his trust account in connection with the settlement of Taimika Hugley's case. This was the first deposit respondent made into his trust account in connection with this [Hugley] case.

"On December 12, 2002, respondent wrote a check from his trust account payable to Ray Toulson in the amount of $2,100.10. On December 13, 2002, respondent deposited $2,154.55 and $3,800.00 into his trust account in connection with the settlement of Ray Toulson's case. These were the first deposits respondent made into his trust account in connection with this [Toulson] case.

"On December 20, 2002, respondent wrote a check from his trust account payable to Carol Walker in the amount of $1,461.68. On December 23, 2002, respondent deposited $1,642.50 and $2,500.00 into his trust account in connection with the settlement of Carol Walker's case. These were the first deposits respondent made into his trust account in connection with this [Walker] case.

"On February 14, 2003, respondent wrote a check from his trust account payable to Rosita Inman in the amount of $1,250.00. On February 20, 2003, respondent deposited $4,050.00 into his trust account in connection with the settlement of Rosita Inman's case. This was the first deposit respondent made into his trust account in connection with this [Inman] case.

"On March 11, 2003, respondent wrote a check from his trust account payable to Cindy Littlejohn in the amount of $1,611.67, when at that time only $77.00 was on deposit in the trust account in connection with Ms. Littlejohn's case. On March 12, 2003, respondent deposited $2,500.00 into his trust account in connection with the settlement of Cindy Littlejohn's case.

"On May 2, 2003, a check payable to Charmain Chisholm in the amount of $1,459.47 was cashed against respondent's trust account. On May 6, 2003, respondent deposited $4,500.00 into his trust account in connection with the settlement of Charmain Chisholm's case. This was the first deposit respondent made into his trust account in connection with this [Chisholm] case. In this instance, the bank cashed a post-dated check.

"On April 29, 2003, a check payable to James White in the amount of $2,135.85 was cashed against respondent's trust account. On April 30, 2003, respondent deposited $4,500.00 into his trust account in connection with the settlement of James White's case. This was the first deposit respondent made into his trust account in connection with this [White] case. In this instance, the bank cashed a post-dated check.

"On December 7, 2004, a check account [sic] payable to Wesley Ross in the amount of $250.00 was cashed against respondent's trust account. On December 8, 2004, respondent deposited $3,000.00 into his trust account in connection with the settlement of Wesley Ross' case. This was the first deposit respondent made into his trust account in connection with this [Ross] case. In this instance, the bank cashed a post-dated check.

"On June 30, 2005, a check payable to Elizabeth White in the amount of $1,370.04 was cashed against respondent's trust account, when there was only $269.02 on deposit in connection with Ms. White's case. On July 5, 2005, respondent deposited $5,400.00 into his trust account. In this instance, the bank cashed a post-dated check.

"On November 1, 2005, respondent wrote checks from his trust account payable to himself in the amount $209.00 and

$200.00 in connection with the bankruptcy case of Laquandra Malloy, when at the time there was only $200.00 on deposit in his trust account. On January 24, 2006, respondent deposited $309.00 into his trust account in connection with Ms. Malloy's case.

"**B. Conclusions of Law**

"The conduct described above violates Business Occupations and Professions § 10–306, which provides that 'a lawyer may not use the trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.'

"Respondent's use of others' funds to pay clients who had no money on deposit in his trust account is a misuse of trust money and a violation of BOP § 10–306. *Attorney Grievance Commission v. Zuckerman,* [386 Md. 341, 372–73,] 872 A.2d 693, 711–12 (2005). Discounting the five post-dated checks as a result of bank error, there were 11 instances of this conduct between July 2002 and November 2005.

"**III. Rules 1.1, 1.3, 1.15(d) and 8.4(d)**
**(Failure to promptly pay)**

"**A. Findings of Fact**

"A review of respondent's trust account showed that as of January 30, 2006, there were 63 clients who had funds on deposit in his trust account, some of them dating back as far as 2002. Petitioner's exhibit 12 shows the breakdown of positive balances the respondent had each year between 2002 and 2006. In 2002 there were three positive balances, which increased the following year of 2003 to ten positive balances. In 2004 there were eighteen positive balances and then in 2005 there were twenty-six positive balances in respondent's trust account. The number decreased in 2006 to six clients.

"Respondent has represented that individuals who had positive balances have now been paid. Respondent has now closed his practice. Bar Counsel has received no complaints concerning respondent's failure to pay.

"**B.   Conclusions of Law**

"Rule 1.15(d)  states:

'Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or the third person.  Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or the third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or the third person, shall promptly render a full accounting regarding such property.'

"In *Zuckerman,* the Court of Appeals held that the practice of failing to promptly disburse funds from the trust account violated Rules 1.1 (competence), 1.3 (diligence), 1.15(b), which requires prompt payment of clients and third-parties and which became Rule 1.15(d) on July 1, 2005, and 8.4(d) (conduct prejudicial to the administration of justice). *Zuckerman,* [386 Md. 341, 374–75,] 872 A.2d [at] 709–10, 713.

"It is inferable that after Shannon Becker's thefts respondent continued the practice of holding back funds from personal injury settlements to see if the client's PIP would pay and then did not follow through.  This would probably explain the balances of Romona Jones and Calvin Witherspoon, for instance.  It is also inferable that other balances, such as those of Sirron Whitaker and Myrtle Johnson, can be explained by Rhonda Elkins' thefts of respondent's fees, as respondent was not paid in those cases.  Still others cannot be explained at all, such as those of Larry Eaton, Conswella Ingrams, and Larry Jackson, for whose cases there is no record of any funds being disbursed, even though their cases were settled in July 2004 and June 2005. Respondent appeared in this case through counsel and responded to some of petitioner's evidence on the advance payments; however, he offered no explanation for the positive balances and refused to appear for a deposition, at which he would have been questioned on these issues.  It is

clear that, once again, he was not paying clients and medical providers on a timely basis.

"Respondent's repeated failure to pay clients, as he was required to do, was conduct prejudicial to the administration of justice. The respondent's inactions prevented the appropriate resolution of the client's matter. For this, respondent's conduct was prejudicial to the administration of justice. His conduct violates Rules 1. 1, 1.3, 1.15(d), and 8.4(d)."

As noted previously, neither petitioner nor respondent take exceptions to Judge Prevas' findings.

### Standard of Review

We have held that in proceedings involving attorney discipline, this Court has original and complete jurisdiction. *Zuckerman,* 386 Md. at 363, 872 A.2d at 706 (citing *Attorney Grievance Comm'n v. James,* 385 Md. 637, 654, 870 A.2d 229, 239 (2005); *Attorney Grievance Comm'n v. O'Toole,* 379 Md. 595, 604, 843 A.2d 50, 55 (2004)). Further, the hearing judge's findings must be supported by clear and convincing evidence. *Zuckerman,* 386 Md. at 363, 872 A.2d at 706 (citing *Attorney Grievance Comm'n v. Calhoun,* 391 Md. 532, 553, 894 A.2d 518, 531 (2006); *Attorney Grievance Comm'n v. Gore,* 380 Md. 455, 468, 845 A.2d 1204, 1211 (2004); Maryland Rule 16–757(b) ("The petitioner has the burden of proving the averments of the petition by clear and convincing evidence.")). Unless clearly erroneous, we will accept the hearing judge's findings of fact. *Zuckerman,* 386 Md. at 363, 872 A.2d at 706 (citing *Attorney Grievance Comm'n v. Potter,* 380 Md. 128, 151, 844 A.2d 367, 380–81 (2004)); *Attorney Grievance Comm'n v. Calhoun,* 391 Md. at 553, 894 A.2d at 531. Any conclusions of law, however, are subject to our *de novo* review. *Calhoun,* 391 Md. at 553, 894 A.2d at 531; *Attorney Grievance Comm'n v. Weiss,* 389 Md. 531, 545, 886 A.2d 606, 614 (2005); *Zuckerman,* 386 Md. at 363, 872 A.2d at 706.

### Discussion

Respondent's offenses can be summarized as the following: (1) paying clients before funds belonging to them were depos-

ited in his trust account; (2) failing to pay individuals who had funds on deposit in his trust account promptly; and (3) failing to adequately supervise his employee, Rhonda Elkins.

■ With respect to the first violation, i.e., paying clients before funds belonging to them were deposited in respondent's trust account, respondent violated BOP § 10–306 via this mismanagement of his trust account. Section 10–301(d) of the BOP Article defines trust money as: "[A] deposit, payment, or other money that a person entrusts to a lawyer to hold for the benefit of a client. . . ." *Zuckerman,* 386 Md. at 372, 872 A.2d at 711; *Attorney Grievance Comm'n v. Blum,* 373 Md. 275, 298, 818 A.2d 219, 233 (2003); *Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 813 A.2d 1145 (2002). Where a client was paid before the money belonging to them was deposited in the trust account, respondent must have used other clients' funds to make the payment. This would constitute a clear violation of § 10–306 of the BOP Article, which requires that lawyers not use trust money "for *any* purpose other than the purpose for which the trust money is entrusted to the lawyer" (emphasis added). In respondent's previous case, we held that:

"Zuckerman also committed violations of . . . Section 10–306 of the Business Occupations and Professions Article when he disbursed funds to his clients from his trust account before their settlement checks had been deposited into the trust account, thereby providing funds belonging to one client to another. The record establishes that this was a routine practice in [respondent's] office and on occasion months would lapse before the settlement checks for the clients would be deposited into the trust account. . . . We have held that such a failure to maintain the integrity of client funds violates Section 10–306."

*Zuckerman,* 386 Md. at 372–73, 872 A.2d at 712.

In *Attorney Grievance Comm'n v. Glenn,* the respondent was in receipt of settlement funds for a client, and correctly deposited those funds into his escrow account. Over the course of time, however, as Glenn continued to hold those

funds at the client's request, the balance in the account fell below what was owed to those clients. There, we held that where: "(1) there were funds missing that [Glenn] admittedly cannot account for; and (2) the escrow account suffered balances too low, reflecting funds out of trust," such acts constituted a violation of § 10–306 of the BOP Article. *Attorney Grievance Comm'n v. Glenn*, 341 Md. 448, 462, 671 A.2d 463, 470 (1996). In respondent's previous case, we held *Glenn* to be controlling, even where the issue revolved around trust accounts as opposed to escrow accounts. In the instant case, again involving trust accounts, respondent disbursed funds to clients before depositing sufficient funds in the trust account. Despite the fact that in most instances only several days would pass between the disbursement and the deposit, and no clients were harmed, it is clear that respondent continued a practice that we previously held to be violative of the BOP Article § 10–306.

■ With respect to the second violation, i.e., failing to pay individuals who had funds on deposit in his trust account promptly, this again appears to be a continuation of a practice that we held in respondent's previous case to be violative of MRPC 1.1, 1.3, and 1.15(b) (the 2005 version of 1.15(b) is currently numbered as 1.15(d)). MRPC 1.15(d) requires the *prompt* notification and deliverance of funds in which a client or third party has an interest. In *Attorney Grievance Comm'n v. Stolarz*, 379 Md. 387, 842 A.2d 42 (2004), Stolarz's client obtained a loan from a bank by using his potential recovery in a personal injury case as collateral. While Stolarz did not originally know of the transaction between his client and the bank, he ultimately executed an Attorney Acknowledgment agreeing to honor the bank's lien out of any funds received by settlement or court order on behalf of that client, but the agreement did not make Stolarz a personal guarantor on the loan. The personal injury case was ultimately settled, and Stolarz prepared a memorandum for his client listing all disbursements from the settlement funds. The loan from the bank to the client was not listed. While the memorandum required the client to advise Stolarz if any expenses were not

listed, no mention of the loan from the bank was made. Eventually, the bank contacted Stolarz in an attempt to collect on the loan. Stolarz contacted his client, and made efforts to have the client repay the loan, but was ultimately unsuccessful. The bank subsequently filed a complaint with the Attorney Grievance Commission against Stolarz. In that case, the hearing judge found, and we agreed, that Stolarz had violated MRPC 1.15(b) (currently numbered as MRPC 1.15(d)) by failing to promptly notify the bank that settlement funds had been received, as the bank was a third party with an interest in the funds.

In respondent's previous case, we held *Stolarz* to be controlling with respect to the same issue presented here. We further held that: "[A] respondent's failure to promptly deliver money to a client and to pay third parties demonstrates incompetence in violation of the Rules.... Thus, we conclude that Mr. Zuckerman's conduct constitutes a violation of Rule 1.1." *Zuckerman,* 386 Md. at 369, 872 A.2d at 710 (citing *Attorney Grievance Comm'n v. Morehead,* 306 Md. 808, 821, 511 A.2d 520, 527 (1986)). Additionally, "Mr. Zuckerman's failure to pay medical bills in a timely manner and to disburse client funds also demonstrates a lack of reasonable diligence in violation of Rule 1.3...." *Id.* And finally, we found that respondent's failure to pay his clients as he was required constituted conduct prejudicial to the administration of justice (MRPC 8.4(d)). We stated:

> "We have found violations of Rule 8.4(d) when the lawyer misappropriated client funds or misused his or her trust account. *See Attorney Grievance Comm'n v. Brown,* 380 Md. 661, 846 A.2d 428 (2004) (misappropriation of client funds); *Attorney Grievance Comm'n v. Gallagher,* 371 Md. 673, 810 A.2d 996 (2002) (misappropriation of client funds); *Attorney Grievance Comm'n v. Santos,* 370 Md. 77, 803 A.2d 505 (2002) (commingling client funds into operating account); *Attorney Grievance Comm'n v. Powell,* 369 Md. 462, 800 A.2d 782 (2002) (misuse of attorney trust account); *Attorney Grievance Comm'n v. McCoy,* 369 Md. 226, 798 A.2d 1132 (2002) (commingling of client

funds); *Attorney Grievance Comm'n v. Snyder,* 368 Md. 242, 793 A.2d 515 (2002) (misuse of trust account); *Attorney Grievance Comm'n v. Hollis,* 347 Md. 547, 702 A.2d 223 (1997) (misappropriation of client funds)."

*Zuckerman,* 386 Md. at 374, 872 A.2d at 713. As the failure here was the same as in the previous case, i.e., respondent failed to disburse funds to clients in a timely manner, we hold that this act was in violation of MRPC 1.15(d), 1.1, 1.3 and 8.4(d).

We turn to respondent's final offense, i.e., his failure to supervise adequately his employee, Rhonda Elkins. We again look to respondent's previous case, where he failed to supervise adequately another, different employee. There, respondent delegated to that employee the task of balancing the trust account and reconciling the bank statements. The hearing judge found that the respondent made no effort to ensure that the employee accomplished her task, and that employee stole from respondent's trust account. In the instant case, respondent delegated to Rhonda Elkins the task of dealing with the consequences of the original theft in addition to management of the day-to-day operations of respondent's trust account. Again, as noted by Judge Prevas, *supra,* he failed to correct his funds disbursement system, which allowed Rhonda Elkins to steal from him in the same manner that the previous employee had. In the previous case, we stated:

" '[R]espondent did not instruct his employees of the proper management of the trust account and inform himself of the status of his employees' efforts to monitor the funds in the account.' Such a failure to oversee his employees' tasks constitutes a violation of MRPC 5.3(a) and (b) because Mr. Zuckerman did not make reasonable efforts to ensure that his employees' conduct complied with his own professional obligations. We have held that 'had the respondent exercised a reasonable degree of supervision over [his employee], he might have detected [the employee's] error before any ethical proscriptions had been violated' under Rule 5.3. *Glenn,* 341 Md. at 481,

671 A.2d at 479 (quoting *Attorney Grievance Comm'n v. Dacy*, 313 Md. 1, 5, 542 A.2d 841, 843 (1988))."

*Zuckerman*, 386 Md. at 374, 872 A.2d at 712–13. We therefore hold that respondent again violated MRPC 5.3.

### Sanctions

■■■ We have held that in deciding the appropriate sanction for violations of the MRPC, each case be individually evaluated, that the facts and circumstances be taken into account, and that mitigating factors be taken into account. *Calhoun*, 391 Md. at 570, 894 A.2d at 540–41 (citing *Attorney Grievance Comm'n v. Cherry–Mahoi*, 388 Md. 124, 160, 879 A.2d 58, 80 (2005); *Zuckerman*, 386 Md. at 375, 872 A.2d at 713). Additionally, "[t]he attorney's prior grievance history ... constitutes part of those facts and circumstances." *Calhoun*, 391 Md. at 571, 894 A.2d at 541 (quoting *Attorney Grievance Comm'n v. Franz*, 355 Md. 752, 761, 736 A.2d 339, 344 (1999)). *See also Maryland State Bar Ass'n v. Phoebus*, 276 Md. 353, 362, 347 A.2d 556, 561 (1975). The purpose of disciplinary proceedings is to protect the public rather than to punish the attorney who erred. *Calhoun*, 391 Md. at 571, 894 A.2d at 541 (citing *Attorney Grievance Comm'n v. Wallace*, 368 Md. 277, 289, 793 A.2d 535, 542 (2002); *Franz*, 355 Md. at 760–61, 736 A.2d at 343–44).

■■ With respect to the instant case, Judge Prevas noted the following mitigating factors:

"Respondent has been in good standing with the Maryland Bar for thirty-three years. Respondent has had no other problems beyond this issue. Although this has been a continuing dilemma, respondent made efforts to correct the situation by reporting Ms. Elkins to the police as well as relaying the matter to the Attorney Grievance Commission. In an effort to protect his clients, respondent also obtained employer dishonesty insurance after the first incident. No clients have complained of monies owed to them as respondent has represented he has compensated all clients.

"Respondent has taken his own remedial measures to rectify the situation and has voluntarily placed himself on inactive status with the Maryland Bar as of July 1, 2007. . . . Respondent is also taking part in the Maryland State Bar Association's Lawyer Assistance Program and according to a letter submitted by the Director, James P. Quinn, respondent is referred to as 'an excellent client.' . . .

"Several attorneys have also written letters submitted to the Court on respondent's behalf. Respondent informed a prominent law firm, Gordon Feinblatt, LLC, who hired Ms. Elkins after the incident with the respondent, of her misconduct. As a result of the notification, Ms. Elkins was terminated. The firm provided a letter of gratitude on respondent's behalf. . . . Stuart H. Arnovits, of the firm Cohen, Snyder, Eisenberg, and Katzenberg, P.A. also wrote a letter on respondent's behalf. This firm was also considering employing Ms. Elkins, but after contacting respondent, who provided the firm with information regarding Ms. Elkin's wrongdoing, she was not hired. Attorney Arnovits wrote a letter to the Court expressing his gratitude for respondent's assistance in that matter. . . . Sidney Schlachman of Schlachman, Belsky, and Weiner, P.A. as well as attorney Roland Walker from the Law Offices of Roland Walker and Marc Zayon, write favorably of respondent's talents as an attorney and ethics as a human being. . . ."

Bar Counsel recommends a sanction of indefinite suspension, while respondent recommends a sanction of suspension for six months. In *Attorney Grievance Comm'n v. DiCicco,* 369 Md. 662, 802 A.2d 1014 (2002), we found DiCicco to be in violation of MRPC 1.15, 8.4, § 10–306 of the BOP Article, among several others. There, we noted that where the misappropriation of client funds was found to be unintentional, and where that misappropriation did not result in financial harm to clients, an indefinite suspension would be appropriate. *DiCicco,* 369 Md. at 687, 802 A.2d at 1028. There, he was permitted to seek reinstatement after 90 days. *Id.* at 688, 802 A.2d at 1028. In respondent's previous case, where he was found to have violated the MRPC under similar circumstances as the

present case, we issued a sanction of indefinite suspension with the right to apply after thirty days. In the instant case, after balancing the mitigating factors, *supra*, and respondent's previous case before us, we hold that the appropriate sanction would be an indefinite suspension with right to apply after 90 days.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION.