619 A.2d 100

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Stanley E. PROTOKOWICZ, Jr.

Misc. (Subtitle BV) No. 26, Sept. Term, 1991.

Court of Appeals of Maryland.

Feb. 5, 1993.

James P. Botluk, Asst. Bar Counsel, for Atty. Grievance Com'n of Maryland, for petitioner.

Richard M. Karceski, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

McAULIFFE, Judge.

The Attorney Grievance Commission filed disciplinary charges against respondent concerning respondent's conduct while representing Thomas Sanders in a divorce action, his subsequent criminal conduct when he and Mr. Sanders broke into the home in which Mr. Sanders' estranged wife resided,[1] and his conduct during the ensuing investigations. Pursuant to Maryland Rule BV9(b), we referred the charges to Judge J. William Hinkel of the Circuit Court for Baltimore County, for hearing. In the following paragraphs, we set forth Judge Hinkel's findings of fact.

"In November, 1990, Nancy Sanders consulted attorney Lisa Mervis to discuss her contemplated separation from her husband. At that time, Ms. Sanders advised Ms. Mervis that as soon as Mr. Sanders learned of her intentions, he would probably consult their friend, Stan Protokowicz. When Ms. Sanders left her husband on April 8, 1991, her prediction proved to be correct. On April 9, 1991, Mr. Sanders went to his friend, the respondent Stanley Protokowicz. Respondent suggested that Mr. Sanders seek another lawyer but Mr. Sanders persisted and respondent finally agreed to represent Mr. Sanders. That same day, respondent spoke with Ms. Mervis and advised her of his representation of Mr. Sanders. Upon learning of respondent's undertaking the representation of her husband, Ms. Sanders expressed surprise but did not object.

"It appears that discussions and negotiations between Ms. Mervis and respondent proceeded smoothly for several

---

**1.** This home, to which Ms. Sanders went when she left the marital home, was owned by Ms. Sanders' father. For convenience, we shall refer to it as Ms. Sanders' home.

weeks until Mr. Sanders learned that Ms. Sanders was having an adulterous affair. Suit was filed and the acrimony began.

"On May 22, 1991, there was a hearing before Harford County Circuit Court Judge Cypert Whitfill following which the parties and their lawyers met in respondent's office. It was during this meeting to discuss child custody and visitation that respondent referred to Ms. Sanders as a slut. Although respondent testified that it was Ms. Mervis who first referred to her client as a slut, the court finds respondent was the first to use the term. Apparently respondent was extremely emotional about Ms. Sanders conduct which he termed immoral. During this period there were rumors that there had been more than one adulterous affair during their marriage.

"Some of those rumors persisted and perhaps originated at the country club. There was some attempt by some members of the country club to bar Ms. Sanders' use of the club swimming pool. Apparently Mr. Sanders was behind Ms. Sanders' exclusion. It appears the pool manager had ordered that Ms. Sanders pay a $10 fee to babysit her children at the pool.

"On June 28, 1992, while respondent was vacationing in Ocean City, Maryland, Ms. Mervis telephoned soliciting his assistance regarding the swimming pool use. After gaining some information regarding this problem, respondent again spoke with Ms. Mervis. In response to Ms. Mervis' questioning as to why this was happening at the club, respondent speculated that prior to the Sanders' marital problems, Ms. Sanders was very popular at the club. Women members would circle around her when she put her chair down at the pool and now when she put her chair down, the others turned their chairs away.

"Ms. Mervis referred to Ms. Sanders as a JAP, saying that if Ms. Sanders weren't Jewish, she should be because she's a Jewish American Princess. (Ms. Mervis attributes that reference to respondent.) In response to Ms. Mervis'

insistence on an explanation of why the women at the country club were snubbing Ms. Sanders, respondent said, 'Lisa, if I went into your Temple this week and shit on the floor, you wouldn't welcome me back next week.' Ms. Mervis testified that she was offended and took the remarks as anti-semitic.

"Upon respondent's return to his law office on July 8, 1991, there was a copy of a motion filed in the divorce proceeding seeking his and his law firm's removal as counsel. Ms. Sanders testified that at some point Ms. Mervis said that she felt as though the case would never settle because Mr. Protokowicz was taking the case so personally and that she, Ms. Mervis, couldn't talk with respondent.

"The Ex Parte Motion for Removal filed by Ms. Mervis and entered as petitioner's Exhibit 4–K alleged that respondent was guilty of various deeds of misconduct that breached the Maryland Rules of Professional Conduct and further alleged a conflict of interest. The conflict allegation arises from the fact that about six (6) years before the divorce action, respondent's law firm represented Mr. and Mrs. Sanders in a real estate transaction. The matter was handled by Donald Fry, a partner in the firm and not by respondent. The evidence clearly shows that Ms. Sanders was aware of this and that she made Ms. Mervis aware. Prior to the filing of the Ex Parte Removal, the matter was never brought to respondent's attention by Ms. Mervis. Ms. Sanders testified that the real reason for wanting respondent out of the case was because of the respondent's emotional involvement in the case.

"A hearing was held before Judge Whitfill on July 10, 1991. No ruling on the motion was filed according to the docket entries (petitioner's Exhibit 4–A). However, on July 17, 1991, respondent's appearance as counsel was stricken and the appearances of John C. Love and Margaret A. Attenasio were entered for Mr. Sanders.

"On September 4, 1991, respondent and his wife Leslie separated and shortly thereafter, respondent moved in with

Mr. Sanders at the Sanders' former marital home on McPhail Road. Ms. Sanders had moved into a house owned by her father at 921 Buckland Place, Bel Air, Maryland when she separated from Mr. Sanders in April of 1991.

"In the evening of October 12, 1991, Mr. Sanders had been to Ms. Sanders home to search for corporate papers/stock certificates. Apparently unsuccessful, he returned the next evening with respondent. In the afternoon of October 13, 1991, respondent had been to a bull roast and drank several beers. Later that evening he consumed a half fifth of rum. When respondent and Mr. Sanders departed for Ms. Sanders' house, both were intoxicated.

"Ms. Sanders had spent that weekend in Annapolis and Ocean City, Maryland and upon her return home at about 10:00 p.m. on Monday, October 14, 1991, she and her children found their kitten, Max, on the kitchen floor. Max was dead. He was wet and there was a odor of champagne about him.

"It was clear to Ms. Sanders that someone had been in her house. A photo of daughter Kerry on the refrigerator was disturbed, her contraceptive was found on the bathroom floor, bedroom dresser drawers were open and letters and underwear were moved about. The toilet was clogged and flooded the bathroom the next day.

"Ms. Sanders later discovered a fish decoy was missing and subsequently learned that items of jewelry were missing as well. Kerry's watch was found in the driveway. On Friday, October 18, Ms. Sanders used her microwave oven for the first time since the death of Max. She was defrosting a bagel and smelled the distinct odor of cat. Upon examining the interior of the microwave, she observed cat hair. It was then she realized how Max had died.

"Precisely what happened in the early morning hours of October 14 is not at all clear. The evidence, however, is sufficient to persuade the court that respondent and Mr. Sanders entered the home of Ms. Sanders without authorization, ransacked it, clogged the toilet, stole personal prop-

erty and killed the family kitten Max. The court rejects respondent's contention that Max's death was accidental.

"Within a week of the incident, respondent had told his law partners of his involvement and retained attorney Augustus Brown. Subsequently, respondent gave a statement to the Harford County Deputy Sheriff Keithley. On January 17, 1992, respondent pled guilty to two misdemeanors: breaking and entering a dwelling house and cruelty to animals. He was given one year for breaking and entering and 90 days for cruelty to animals. The sentences were made concurrent and suspended. Respondent was placed on probation for 18 months with conditions that require alcohol counseling and community service. Respondent was also required to make restitution and pay for any counseling required by Ms. Sanders and the children as a result of the incident. He was fined $1,000.00 and required to pay the court costs. Respondent's probation is supervised by Mr. Richard Vincent, the Director of the Lawyer Counseling Committee for the Maryland State Bar Association."

Judge Hinkel concluded that respondent had violated the Maryland Rules of Professional Conduct in several respects. He found respondent had violated Rule 1.16 by not withdrawing from Mr. Sanders' case earlier than he did. Judge Hinkel also found respondent had violated Rules 1.2, 3.4, and 8.4 by reason of respondent's unlawful entry of Ms. Sanders' home and his activities therein. Finally, Judge Hinkel found that mitigating circumstances existed:

I am persuaded that the events of October 14, 1991 were the result of respondent's intoxication, his emotional involvement in the Sanders divorce proceeding and his otherwise unstable psychological state at the time due to the death of a dear friend and the loss of his wife to another....

Respondent filed exceptions to all findings of violations, except as to Rule 8.4 (misconduct), which he admitted. Bar Counsel filed exceptions to Judge Hinkel's failure to find violations of Rules 3.3 and 8.1, which charged respondent

with having knowingly made false statements of material facts.

Respondent's exceptions to findings that he violated Rules 1.2 and 3.4 may be considered together.[2] Rule 1.2(d) provides:

A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

Judge Hinkel found that although respondent no longer formally represented Mr. Sanders at the time of the break-in, he had nevertheless "counseled Mr. Sanders regarding the property and assisted Mr. Sanders in the criminal activity." Rule 3.4(a) provides:

A lawyer shall not:

(a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act. . . .

Judge Hinkel found that the purpose for entering Ms. Sanders' home was to obtain documents relating to the divorce proceeding which had potential evidentiary value, and that respondent counseled and assisted Mr. Sanders in violation of these rules.

The gravamen of respondent's exception to these findings is that he was too drunk to have knowingly or intentionally given advice or assistance to Mr. Sanders about anything. Our review of the record discloses that Judge Hinkel's

---

**2.** Respondent also excepted to a perceived finding that he had violated Rule 4.4. Although Judge Hinkel commented that the evidence was sufficient to support a finding of a violation of Rule 4.4, he did not make a specific finding of a violation of that rule, probably because the charges overlap for the same conduct.

findings on this issue were supported by clear and convincing evidence and we overrule these exceptions.

Respondent's remaining exception has merit. Judge Hinkel found that respondent violated Rule 1.16, which provides in pertinent part as follows:

(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

. . . .

(2) the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client. . . .

Judge Hinkel found:

Respondent was clearly too emotionally involved in a dispute between his client (who was his best friend) and the client's wife (who was also a close friend of long standing). While the court does not find that undertaking the representation offends the Rule, there is no doubt that respondent should have withdrawn from the case before the Ex Parte Motion for Removal was filed.

We do not find clear and convincing evidence to support this finding. There is no doubt that respondent's belief in his client's cause and his dislike for, and disappointment in, Ms. Sanders caused his approach to this case to exceed that of clinical or dispassionate counseling. Emotional involvement in a client's case, although often disadvantageous, is not grounds for mandatory withdrawal. As Judge Hinkel found in denying Bar Counsel's claim that respondent had violated Rule 1.1, which requires a lawyer to provide competent representation to a client, "[t]here is no evidence that can substantiate this allegation. All of the evidence is to the contrary and establishes that respondent is a skilled and competent lawyer."

Respondent's escalating emotional involvement in the divorce case manifested itself in his verbal conduct toward Ms. Sanders and her attorney. This conduct was made the subject of a separate charge of misconduct, which Judge

Hinkel also found was not proved. He said: "While the language used by respondent was both inappropriate and offensive, the court is unable to find under the circumstances that respondent's conduct violated any Rule of Professional Conduct." We think respondent prudently withdrew his appearance after Ms. Sanders' motion had been filed and the matter had been heard by, and discussed with, a judge of the Circuit Court for Harford County. We fail to find evidence of record sufficient to support a finding that respondent violated Rule 1.16 by not withdrawing earlier. Respondent's exception to that finding is sustained.

Bar Counsel's exceptions raise an interesting question. Respondent told the investigating officers, Attorney Grievance Commission representatives, a judge of the Circuit Court for Harford County, and this Court in an earlier proceeding involving this case,[3] that he accidentally turned the microwave oven on when the cat was in it. The Attorney Grievance Commission contends that in so doing respondent made knowingly false statements in violation of Rules 3.3 and 8.1. Judge Hinkel found that the cat's death was not accidental, but he also found that the Attorney Grievance Commission had not proven by clear and convincing evidence that respondent knowingly made a false statement of a material fact.[4] Judge Hinkel said: "Merely

---

**3.** Upon respondent's conviction of breaking and entering the dwelling house of another, Article 27, § 31A of Maryland Code (1957, 1992 Repl. Vol.), and cruelly killing an animal, Article 27, § 59, the Attorney Grievance Commission requested the immediate suspension of respondent pursuant to Maryland Rule BV16. After hearing, we entered an order suspending respondent effective 9 June 1992. *Attorney Grievance Comm'n v. Protokowicz,* 326 Md. 714, 607 A.2d 33 (1992).

**4.** Judge Hinkel made this finding with respect to the charge of a violation of Rule 8.1. He held that Rule 3.3 was inapplicable because that Rule applied only to attorneys who were representing someone else. We do not read Rule 3.3 so narrowly. That is of no importance in the ultimate outcome of the case, however, because we accept Judge Hinkel's finding that the evidence is insufficient to demonstrate

because respondent does not admit to or agree with the petitioner's charges and persists in the position that his version is true, does not constitute a violation of this rule."

Respondent points out that, as found by Judge Hinkel, respondent was intoxicated at the time the cat was killed, having consumed several beers and a half of a fifth of rum. Respondent testified that due to his condition he could remember only bits and pieces of the incident, and even that recollection was foggy and unfocused. He suggests that a form of psychological defense mechanism may have supplied the missing gaps in his memory—an innocent confabulation—thereby producing a "recollection" that is neither accurate nor intentionally misleading. Not all misstatements are lies, he says; some are mistakes, some are slips or tricks of memory, or products of subconscious rationalization.

The finding made by Judge Hinkel involves the subjective intent of the respondent, a matter that is peculiarly within the province of the fact finder. The hearing judge was present, heard the witnesses, and observed their demeanor. His finding in this instance is not clearly erroneous. We overrule the exceptions of Bar Counsel.

The final question in this case involves the appropriate sanction to be imposed. Respondent is guilty of serious misconduct. He, along with Mr. Sanders, broke into[5] the home of Ms. Sanders, intending to take materials having evidentiary value in pending litigation. Once inside, they rummaged through the house, taking items of personal property, spilling alcohol, and somehow clogging the toilet. The respondent placed the Sanders' cat in the microwave oven and activated the oven, killing the cat. This is outrageous behavior, a world apart from what this Court, the

---

by clear and convincing evidence that respondent knowingly made a false statement of a material fact.

5. The "breaking" was apparently accomplished by Mr. Sanders inserting the correct combination into a key pad that operated the garage door.

profession, and the public is entitled to expect from members of the bar.

As previously indicated, the hearing judge did find that these events were the result of respondent's intoxication, his emotional involvement in the divorce proceeding, and his otherwise unstable psychological state at the time due to the death of a dear friend and the loss of his wife to someone else. Judge Hinkel concluded that "[r]espondent's conduct on October 14, 1991 appears to have been an aberration and not likely to be repeated."

Respondent has been convicted of criminal offenses as a result of this incident, and sanctions have been imposed. He has been suspended from the practice of law in this State since 9 June 1992 as a result of this incident. *See Attorney Grievance Comm'n v. Protokowicz,* 326 Md. 714, 607 A.2d 33 (1992) (imposing immediate suspension pursuant to Maryland Rule BV16). After this incident occurred, respondent contacted Richard Vincent, Director of the Lawyer Counseling Committee of the Maryland State Bar Association, and he has followed Mr. Vincent's directions concerning treatment for alcoholism. In November, 1991, respondent began outpatient treatment for alcoholism at the New Beginnings Treatment Center. He is regularly attending Alcoholics Anonymous. He states that he has maintained his sobriety since the incident and was found by Judge Hinkel to be "well on his way to recovery."

Respondent has been a member of the bar of this Court for 13 years, without a previous blemish on his record. The record discloses that with the exception of this incident, respondent has conducted himself as a competent, ethical, and respected attorney, and as a caring member of his community. The hearing judge noted that respondent had apologized to Ms. Sanders and her children, and had, along with Mr. Sanders, made restitution to Ms. Sanders.

The purpose of disciplinary proceedings is to protect the public rather than to punish the erring attorney, although concepts of general and specific deterrence are

consistent with that primary goal. *Attorney Grievance Comm'n v. Owrutsky,* 322 Md. 334, 355, 587 A.2d 511 (1991); *Attorney Grievance Comm'n v. Alison,* 317 Md. 523, 540–41, 565 A.2d 660 (1989). Although respondent's conduct in this case was an aberration, the egregious nature of that conduct warrants the imposition of a significant sanction. We take into consideration that respondent has already been suspended from the practice of law for eight months as a result of this incident, and we direct that he shall be suspended indefinitely from the practice of law with the right to apply for reinstatement not less than one year from the date of filing of this opinion.

IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS PURSUANT TO MARYLAND RULE BV15c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST STANLEY E. PROTOKOWICZ, JR.