76 A.3d 1172

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Leonard J. SPERLING.

Misc. Docket AG No. 47, Sept. Term, 2009.

Court of Appeals of Maryland.

Sept. 27, 2013.

Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland, for Petitioner.

Alvin I. Frederick, Esquire (Mark P. Johnson, Eccleston & Wolf, P.C., Hanover, MD), for Respondent.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY,* ADKINS, and BELL,** JJ.

BELL, C.J. (Retired).

The Attorney Grievance Commission of Maryland ("the petitioner"), acting through Bar Counsel and pursuant to Maryland Rule 16–751(a),[1] filed a Petition for Disciplinary or

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court, but did not participate in the decision or adoption of this opinion.

** Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Maryland Rule 16–751(a) provides:

    "(a) *Commencement of disciplinary or remedial action.* (1) Upon approval of Commission. Upon approval or direction of the Commis-

Remedial Action against Leonard J. Sperling, ("the respondent"). The petitioner alleged that the respondent violated Rules 1.1, Competence;[2] 1.5, Fees, both before and after its amendment;[3] 1.15, Safekeeping Property;[4] 4.2, Communica-

sion, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals."

2. Maryland Lawyers Rules of Professional Conduct (MLRPC) 1.1 requires a lawyer to "provide competent representation to a client," which, in turn, "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

3. Prior to July 1, 2005, MLRPC 1.5 provided, as relevant:
   "(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
      "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
      "(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;
      "(3) the fee customarily charged in the locality for similar services;
      "(4) the amount involved and the results obtained;
      "(5) the time limitations imposed by the client or by the circumstances;
      "(6) the nature and length of the professional relationship with the client;
      "(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;
      "(8) and whether the fee is fixed or contingent"
   Effective July 1, 2005, the first sentence of Rule 1.5(a) was amended to provide: "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses." The factors required to be considered in assessing reasonableness remained unchanged.

4. Prior to July 1, 2005, MLRPC 1.15 provided:
   "(a) A lawyer shall hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
   "(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly

tion with Person Represented by Counsel; [5] 4.4, Respect for Rights of Third Persons; [6] and 8.4, Misconduct,[7] of the Mary-

---

> deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.
> "(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."

After July 1, 2005, and before January 1, 2007, the relevant provisions were codified in paragraphs (a), (d) and (e), with the latter section providing:

> "(e) When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute."

After January 1, 2007, aside from again rearranging the paragraphs, the only change was that paragraph (b) was added. It provides: "A lawyer may deposit the lawyer's own funds in a client trust account only as permitted by Rule 16–607(b)."

5. As relevant, MLRPC 4.2 provides:

> "(a) Except as provided in paragraph (c), in representing a client, a lawyer shall not communicate about the subject of the representation with a person who the lawyer knows is represented in the matter by another lawyer unless the lawyer has the consent of the other lawyer or is authorized by law or court order to do so.
> "(b) If the person represented by another lawyer is an organization, the prohibition extends to each of the organization's (1) current officers, directors, and managing agents and (2) current agents or employees who supervise, direct, or regularly communicate with the organization's lawyers concerning the matter or whose acts or omissions in the matter may bind the organization for civil or criminal liability. The lawyer may not communicate with a current agent or employee of the organization unless the lawyer first has made inquiry to ensure that the agent or employee is not an individual with whom communication is prohibited by this paragraph and has disclosed to the individual the lawyer's identity and the fact that the lawyer represents a client who has an interest adverse to the organization."

6. MLRPC 4.4, as pertinent, provides:

> "(a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that the lawyer knows violate the legal rights of such a person."

land Lawyers' Rules of Professional Conduct ("MLRPC"), as adopted by Maryland Rule 16–812, and Maryland Code (1989, 2004 Repl. Vol.) § 10–306 of the Business Occupations and Professions Article ("BOP").[8]

Pursuant to Maryland Rule 16–752(a), we referred the Petition to the Honorable Michael J. Finifter of the Circuit Court for Baltimore County for the evidentiary hearing required by Maryland Rule 16–757.[9] Following that evidentiary hearing, Judge Finifter issued Findings of Fact and Conclusions of Law pursuant to Maryland Rule 16–757(c)[10]:

---

7.  MLRPC 8.4(a), (c) and (d) provide:
    "It is professional misconduct for a lawyer to:
        "(a) violate or attempt to violate the Maryland Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
        * * * *
        "(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
        "(d) engage in conduct that is prejudicial to the administration of justice[.]

8.  Md. Code (1989 2010 Repl. Vol.) § 10–306 of the Business Occupations and Professions Article provides:
    "A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

9.  Maryland Rule 16–757 provides, in relevant part:
    "(a) **Generally.** The hearing of a disciplinary or remedial action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in a circuit court. Unless extended by the Court of Appeals, the hearing shall be completed within 120 days after service on the respondent of the order designating a judge. Before the conclusion of the hearing, the judge may permit any complainant to testify, subject to cross-examination, regarding the effect of the alleged misconduct. A respondent attorney may offer, or the judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken relevant to the allegations. Bar Counsel may respond to any evidence of remedial action."

10. Maryland Rule 16–757(c) states:
    "(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the

▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆

## *"FINDINGS OF FACT AND CONCLUSIONS OF LAW*

\* \* \*

### *"I.  Findings of Fact*

▆▆  "The Court finds the following facts to have been proven by clear and convincing evidence.

"The Respondent was admitted to the Bar of Maryland on June 23, 1967 and maintains an office for the practice of law at 1777 Reisterstown Road, Pikesville, Maryland 21208.  The Respondent, who has served the community for more than forty-three years, describes his practice as successful and rewarding, having represented and assisted thousands of injured plaintiffs seeking to recover money after suffering personal injuries.

"The Respondent represented Michonda Lucas and Wanda Lee Thompson in connection with injuries each of them sustained in separate automobile accidents.  Ms. Lucas's accident occurred on or about March 2, 2002.  Ms. Thompson's accident occurred on or about February 26, 2003.

"In both cases, the clients and the Respondent executed a Subrogation, Assignment of Rights and Reimbursement Agreement (hereinafter "Agreement"), that assigned to the Food Employees' Labor Relations Association and United Food and Commercial Workers' Health and Welfare Fund (hereinafter "the Fund") any amount recovered in connection with each of the automobile accidents to the extent of the benefits paid by the Fund on behalf of each of the clients. The Agreement executed by the Respondent and Ms. Lucas was signed on or about March 18, 2003 and the Agreement entered into evidence.  *Petitioner's Exhibit 1, sub-exhibit 1.* The Agreement executed by the Respondent and Ms. Thompson was signed on or about April 11, 2003 and it, too, was entered into evidence.  *Petitioner's Exhibit 1, sub-exhibit 22.*

---

clerk responsible for the record no later than 45 days after the conclusion of the hearing.  The clerk shall mail a copy of the statement to each party."

The Respondent executed both assignments that contained express provisions requiring the Respondent to 'withhold and pay' the 'full amount due and owing to the fund without reduction for attorney's fees and costs.' *Petitioner's Exhibit 1, sub-exhibit 22, page 3.* Although Respondent signed the Agreement in both Ms. Lucas's and Ms. Thompson's cases that assigned to the Fund any amounts recovered in connection with the automobile accidents to the extent of the benefits paid by the Fund on behalf of Ms. Lucas and Ms. Thompson (*Petitioner's Exhibit 1, sub-exhibits 1, 22* ), Respondent did not read the Agreement carefully before signing, but relied upon his experience working with other subrogation carriers.

"Ms. Lucas's claims were settled by the Respondent [o]n or about August 2003 for $9,900.00. Ms. Thompson's case was settled [o]n or about December 2003 for $16,232.00. After the Respondent settled their personal injury claims, both Ms. Lucas and Ms. Thompson were promptly paid their portions of the settlement funds.

"The Fund's lien in the *Lucas* case was for the amount of $1,413.56. The Fund's lien in the *Thomas* case was for $4,948.63. In both cases, the Respondent recovered sufficient funds to pay the Fund the full amount of its liens. Although the Fund's lien in Ms. Lucas's case was for the amount of $1,413.56, the Respondent's office was initially informed by the Fund that the Fund's lien in Ms. Lucas's case was for the amount of $884.90. Based upon that information, the Respondent maintained that amount for the Fund's lien in his trust account. There is no clear and convincing evidence that the Respondent's maintaining less than the correct amount of this lien was intentional. The Respondent did not maintain the entire amount of the Fund's lien in trust in the *Thomas* case. He held $4,893.00 in trust. The Respondent's failure to maintain the difference, $55.63, in trust, was not an intentional misappropriation, but was caused by inadvertence or a mathematical error.

"The Respondent did not pay the Fund's liens in each of the two cases, despite his obligation to do so, until on or about

June 18, 2008, after a representative of the Fund filed a complaint with Petitioner.

"The Respondent communicated with the Fund's representatives in connection with his obligation to pay the Fund's lien between August 2003 and June 2008 in connection with the *Lucas* case, and between June 2003 and June 2008 in connection with the lien in the *Thompson* case. The Respondent did not communicate with the Fund or its representatives concerning Ms. Lucas'[s] lien between September 15, 2003 and August 20, 2004. The Respondent did not communicate with the Fund or its representatives concerning Ms. Lucas's lien between December 17, 2004 and October 31, 2005. The Respondent did not communicate with the Fund or its representatives between October 31, 2005 and April 28, 2006 concerning Ms. Lucas'[s] lien. The Respondent did not communicate with the Fund or its representatives between his letter to Ms. Dennis of August 22, 2006 and November 15, 2007.

"In Ms. Thompson's case, between June 13, 2003 and March 4, 2004, the Respondent and the Fund discussed on several occasions the recovery in Ms. Thompson's case and settlement of the Fund's lien. *Petitioner's Exhibit 1, sub-exhibits 23, 24, 27.* Thereafter, however, the Respondent, confronted with the same issues from Ms. Lucas's case, did not have any communication with the Fund or its law firm for approximately three and a half years.

"The Respondent received the letters addressed to him, of which a copy of each is attached to Petitioner's Request for Admission of Facts and Genuineness of Documents and each of said letters was entered into evidence. He drafted the letters executed by him, of which a copy of each is attached to Petitioner's Request for Admission of Facts and Genuineness of Documents and each of those letters was entered into evidence. He forwarded each of said letters to each of the addressees on or about the dates set forth thereon.

"The Respondent was aware of the obligation to maintain the amounts of the Fund's liens in trust and to pay the Fund for its liens pursuant to the requirements of Rule 1.15. He

was aware of those requirements when the two cases were settled and he received the funds sufficient to pay the liens. He recalled having been sanctioned for a violation of that Rule in 1999. The Respondent did not pay the Fund the monies to which it was entitled until almost five (5) years after he received the monies with which to pay the Fund in the *Lucas* case (*Petitioner's Exhibit 1, sub-exhibit 4* ) and approximately four and a half years after he received the monies in the *Thompson* case. *Petitioner's Exhibit 1, sub-exhibit 25.* In Ms. Lucas's case, on August 15, 2003, the Respondent sent a letter to the Fund's law firm, Slevin & Hart, P.C., advising them that Ms. Lucas's settled for $9,900.00, and asking the Fund to waive its $884.90 lien in view of the fact that the special damages were $6,957.45. *Petitioner's Exhibit 1, sub-exhibit 5.* The response he received from the Fund's law firm was 'no.' No reduction in the lien for Ms. Lucas was acceptable. *Petitioner's Exhibit 1, sub-exhibit 6.* He did not respond. On August 20, 2004, more than eleven months later, and despite Respondent's letter of August 15, 2003 to counsel for the Fund advising of the *Lucas* settlement, counsel for the Fund asked Respondent to advise them of the outcome of the *Lucas* case and 'If you have received a recovery, please advise of the source amount.' *Petitioner's Exhibit 1, sub-exhibit 8.* On December 8, 2004, Respondent communicated with the Fund's law firm and he continued to press the Fund to reduce the lien which he erroneously set forth as $884.90 (instead of the correct amount of $1,413.56 that was communicated to him in September of 2003). *Petitioner's Exhibit 1, sub-exhibits 6, 9.* He wanted the firm to agree to a 'low ball park figure' to close out the matter. The fund's law firm replied on December 13, 2004 in an attempt to set the record straight: the lien amount was not $884.90 but was $1,413.56; the Fund (as stated in its letter of more than a year before) would not waive its lien and would not accept a reduction. *Petitioner's Exhibit 1, subexhibit 10.* On December 15, 2004, the Respondent sent a letter to the Fund's law firm, referring to the Respondent's alleged entitlement to an 'attorney's fee, which is accepted at one-third.' *Petitioner's Exhibit 1, sub-exhibit 11.* The Re-

spondent did not lie to or mislead the Fund about the fee. The Respondent testified that the demands for a fee were, in reality, simply a 'tool' to achieve a larger payout for his client. His stated objective in dealing with the Fund was to obtain reduction in the lien pertaining to his client, to whom any pecuniary benefit would have been paid. That is, the Respondent had no personal pecuniary stake in the outcome, having been paid in full for his services as a result of the personal injury settlement.

"Stephanie Oliva, a paralegal for the Fund's counsel, wrote a letter, dated December 17, 2004, addressing the Respondent's claim for a fee and the Respondent, at the hearing, had no real issue with the recitation of the law set forth in that letter, the Fund stated emphatically that he was simply not entitled to any fee from the Fund. *Petitioner's Exhibit 1, sub-exhibit 12.* The Fund again demanded payment. The Respondent did not respond. He testified that he did not know if he received the Fund's letter and that, if he did, that he did not review it in detail.

"On October 31, 2005, counsel for the Fund again made demand of Respondent: pay the lien. *Petitioner's Exhibit 1, sub-exhibit 13.* On November 21, 2005, Rose Dennis of the Medical Claims Department of the Fund wrote directly to Ms. Lucas advising her that Respondent had failed to respond to numerous requests for updates on the status of her case and that further benefits to her may be subject to offset. *Petitioner's Exhibit 1, sub-exhibit 14.* A copy of this letter was forwarded to counsel for the Fund, but not to Respondent.

"On April 28, 2006, Respondent wrote a letter to counsel for the Fund, claiming to have paid the lien, as he understood it to be. *Petitioner's Exhibit 1, sub-exhibit 15.* He was mistaken. He again asked for the balance of the lien to be waived. He said that this was the first time in his practice in over 40 years where 'you are not assuming an attorney fee in the collection of your lien, at a 25%–33-1/3% fee.' He admitted in testimony that this was the *only* time he ever dealt with the Fund to that point. Respondent's reference to "you" in his letter was

intended to generally mean third-party subrogation claimants (such as health insurance companies). Respondent testified again that this was not intended to be a fee for the Respondent for collecting the fund to pay the lien. Any reduction of the lien would have been passed to Ms. Lucas as a benefit, as was his customary and ordinary practice. That is, he would have received no pecuniary payment.

"In that same letter, the Respondent also objected to the Fund's decision to unilaterally terminate Ms. Lucas's insurance benefits claiming that there had been no notice to her as she only learned about the problem when she unsuccessfully sought to fill a prescription. The Respondent 'demanded' that the client's 'insurance' be reinstated and that she be supplied with a 'Notice of Right to Protest through the Insurance Commissioner's Office.' The Agreement, signed by the Respondent (*Petitioner's Exhibit 1, sub-exhibit 1*) states if Ms. Lucas refuses 'to cooperate with the fund regarding its subrogation rights ... the Fund has the right to offset such amounts against [her] future benefit payments under the Plan ...' *Petitioner's Exhibit 1, sub-exhibit 1, page 2.* The Fund had deemed Respondent's failure to cooperate to be Ms. Lucas' failure to cooperate.

"Finally, the Respondent sought in his letter of April 28, 2006, to resolve what he now called an 'asserted' and 'alleged lien.' On May 2, 2006, counsel for the Fund again wrote to Respondent, setting forth the correct amount of the lien and insisting on full payment of the lien pursuant to its Agreement and the law, without offset for attorney's fees. In her letter (*Petitioner's Exhibit 1, sub-exhibit 16*) Marilyn Cochran, of the Fund's law firm, appealed to the Respondent's ethical sensitivity by quoting Rule 1.15 of the Maryland Rules of Professional Conduct. Respondent testified that he did not recall reading the May 2, 2006 letter. Respondent did not respond to that letter. Rose Dennis, of the Medical Claims Department of the Fund, wrote to Ms. Lucas, without copying the Respondent, on July 26, 2006. Respondent learned of the correspondence to Ms. Lucas. In response, on August 22, 2006, the Respondent wrote to Ms. Dennis, whom he knew

was represented by counsel. In that letter, the Respondent again sought to resolve the lien. He stated that he had had 'numerous communications back and forth to and from [her] counsel, as they fail to wish to negotiate on this matter,' and he invited Ms. Dennis to contact him 'so that we may discuss an amicable resolution of this lien to finally close out this necessary dialogue.' *Petitioner's Exhibit 1, sub-exhibit 17.* The Respondent recognizes in hindsight that he should not have acted so hastily and communicated directly with Ms. Dennis, and that his conduct constitutes a 'technical' violation of Rule 4.2. He regrets his error.

"On August 28, 2006, the Fund's counsel wrote to Respondent reiterating the Fund's position against reducing its lien but invited the Respondent to provide information by September 6, 2006 that would permit the Fund to 'reconsider its position.' *Petitioner's Exhibit 1, sub-exhibit 18.* The Respondent did not reply. On January 2, 2007, Ms. Dennis of the Fund wrote to Ms. Lucas again threatening offset due to Respondent's non-cooperation and non-payment of the lien. *Petitioner's Exhibit 1, sub-exhibit 19.*

"On November 15, 2007, Lynn Bowers, Esquire, counsel for the Fund, wrote to the Respondent. *Petitioner's Exhibit 1, sub-exhibit 20.* Fund's counsel advised Respondent of his ethical responsibilities and that payment of the Fund's lien in full was required. The Respondent did not respond. He testified that he had no recollection of the November 15, 2007 letter. In his May 28, 2008 letter to Petitioner, Respondent referred to the Fund's lien as an 'alleged lien.' He insisted that he was entitled to his fee 'in the collection of the funds to pay the lien.' *Petitioner's Exhibit 1, sub-exhibit 35.* He claimed in his letter to Petitioner that he was still trying to negotiate the lien and was still seeking an attorney's fee (to which, he had been told again and again by the Fund, he was not entitled). On June 18, 2008, Respondent paid both liens to the Fund in full.

"With respect to the lien associated with Ms. Thompson's case, it is stipulated that the Respondent had no communica-

tion with the Fund or its representatives for more than three and a half years. He explained to Petitioner that his inability to reach an agreement 'about the reduction of lien and my attorney's fee for negotiating this lien' in the *Lucas* matter caused him to face 'the same problem with working out the lien for Wanda Thompson,' *Petitioner's Exhibit 1, sub-exhibit 35.*"

As a result of these findings of fact, the hearing court concluded, as a matter of law, that the respondent violated some of the Rules charged and that the petitioner did not prove, by clear and convincing evidence, others. Those found to have been violated were MLRPC 1.1, 1.15, 4.2 and 8.4(d). Those that the court found the petitioner failed to prove were MLRPC 1.5(a), 4.4, 8.4(c) and BOP § 10–306.

The respondent's failure, albeit "inadvertent and/or the product of a mathematical mistake," citing *Attorney Grievance Comm'n v. Stolarz*, 379 Md. 387, 399, 842 A.2d 42, 49 (2004), to retain in his attorney trust account a sufficient amount to cover the total amount of the liens the Fund, the Food Employees' Labor Relations Association and United Food and Commercial Workers' Health and Welfare Fund, had against the recoveries obtained by his clients, Thompson and Lucas, the court concluded, constituted a violation of MLRPC 1.15(a). That he also failed to pay the Fund promptly the lien amounts due to it, the court also concluded, was a violation of MLRPC 1.15(b), 1.15(d) and 1.1. With respect to MLRPC 1.15(b), the violations were determined to have occurred with respect to the recovery of each client and for the periods charged by the petitioner, in the case of Lucas, from August 2003 through June 30, 2005, and for Thompson, for the period December 2003 through June 30, 2005. The failure constituting the MLRPC 1.15(d) violation was also in regard to each client and was for the period July 1, 2005 through June 18, 2008.

MLRPC 4.2 proscribes communication with a person represented by counsel without that person's counsel's consent. Having determined that the respondent intentionally communicated with an employee of the Fund by letter, the hearing

court concluded that, in so doing, the respondent violated that Rule.

As to the charged MLRPC 8.4(d) violation,[11] the court opined:

"This Court finds that the extraordinary delay in tendering payment from trust, in violation of Rule 1.15, does give rise to a violation of Rule 8.4(d) as argued by Bar Counsel. Certainly, the Respondent violated Rule 1.15, and the delay of over four years in tendering payment is, by any measure, extraordinary. For the above-stated reasons, th[is] Court concludes that Respondent's unjustified refusal to pay over trust funds constituting the Fund's liens to the Fund for a period of more than four years impacts negatively the public's perception or efficacy of the courts or legal profession. As such, the Court concludes that such conduct is prejudicial to the administration of justice and therefore is in violation of MRPC 8.4(d)."

The hearing court found that the following mitigation had been proven by a preponderance of the evidence:

---

11. In discussing this violation, the hearing court acknowledged that the respondent's belief that he might be able to benefit his clients by getting the Fund to reduce its lien was, initially, reasonable and made in good faith. As time passed, however, and after the respondent was reminded, by the Fund, that he signed the agreement with regard to the lien, and was provided with legal authority for the Fund's position, the court changed its position, "find[ing] that Respondent's continued retention of the Fund's payment and his continuing demands for the Fund to contribute towards attorneys fees were unreasonable and made in bad faith." The court also expressed concern that the respondent failed to supply information requested by the Fund to permit it to "reconsider its position" or respond to the Fund's factual and legal justification for refusing to do so. So it is that the hearing court observed:

"With respect to the liens, the Respondent never claimed entitlement on his own behalf (or on behalf of his clients) to any more than one-third of the monies he maintained for the Fund. Yet, he never so much as offered the Fund any amount to which it was entitled. Rather, he met the legitimate and documented demands of the Fund's representatives with silence, demands for reduction and finally, demands to be paid a fee. The Respondent held the monies to pay the liens hostage until the Fund relented and reduced its lien or paid him a fee."

"The Respondent recognizes his errors in both cases, and deeply regrets and is truly remorseful for his conduct. The settlement funds in both Ms. Lucas's and Ms. Thompson's cases were held in trust, and the Respondent testified that his intention was to tender payment to the Fund upon resolution of the lien with the Fund. In both cases, the Respondent reimbursed the Fund out of his own personal funds to rectify the errors with regard to maintaining the entire amount of the Fund's liens in trust. Both Ms. Lucas and Ms. Thompson were paid promptly. Neither Ms. Lucas nor Ms. Thompson was harmed as a result of the Respondent's conduct and neither client complained to the Respondent about his representation in these matters (although they complained about the fund's failure to waive its lien). Respondent's conduct did not involve misappropriation of client funds, misuse of trust funds or commingling client funds with operating account or personal funds. There was no evidence that Respondent had any improper or nefarious intention to reap any extra personal pecuniary benefit for himself despite the delay. The Fund eventually received payment in full. Respondent did not mislead anyone or lie to anyone.

"The Respondent acknowledges that he has been sanctioned for violating Rule 1.15 in 1999. The Respondent has implemented changes into his law practice whereby he either resolves any subrogation lien with the carrier within 60 days, or he files an action for interpleader, thus ensuring that there is no likelihood that any significant delay in resolving subrogation claims will be repeated.

"Throughout the grievance process, the Respondent has fully and freely complied with Bar Counsel's requests and been fully forthcoming with any and all disclosures. The Respondent's cooperation with Bar Counsel has been full and complete."

(Footnote omitted).

Neither the petitioner nor the respondent filed exceptions to the hearing judge's findings of facts. Accordingly, we shall "treat the findings of fact as established for the purpose of

determining appropriate sanctions, if any." Md. Rule 16–759(b)(2)(A). Nor did they except to the Conclusions of Law drawn by the hearing judge, which, in any event, we review de novo. Rule 16–759(a). Having conducted that review, we conclude that these conclusions of law are supported by the facts from which they were drawn. We turn, then, to the determination of the appropriate sanction.

The purpose of disciplinary proceedings is to protect the public, rather than to punish the erring attorney. *Attorney Grievance Comm'n v. Paul*, 423 Md. 268, 283, 31 A.3d 512, 521 (2011); *Attorney Grievance Comm'n v. Snyder*, 406 Md. 21, 30–31, 956 A.2d 147, 152 (2008); *Attorney Grievance Comm'n v. Franz*, 355 Md. 752, 760, 736 A.2d 339, 343 (1999); *Attorney Grievance Comm'n v. Myers*, 333 Md. 440, 446–47, 635 A.2d 1315, 1318 (1994); *Attorney Grievance Comm'n v. Goldsborough*, 330 Md. 342, 364, 624 A.2d 503, 513 (1993); *Attorney Grievance Comm'n v. Protokowicz*, 329 Md. 252, 262–63, 619 A.2d 100, 105 (1993); *Attorney Grievance Comm'n v. Myers*, 302 Md. 571, 580, 490 A.2d 231, 236 (1985); *Attorney Grievance Comm'n v. Velasquez*, 301 Md. 450, 459, 483 A.2d 354, 359 (1984); *Attorney Grievance Comm'n v. Montgomery*, 296 Md. 113, 119–20, 460 A.2d 597, 600 (1983). Thus, disciplinary proceedings are a catharsis for the profession, intended to prevent the transgressions of an individual lawyer from bringing its image into disrepute, thereby ensuring the integrity of the bar, as well as a prophylactic for the public. *Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 27, 741 A.2d 1143, 1157 (1999) (citing *Attorney Grievance Comm'n v. Deutsch*, 294 Md. 353, 368–69, 450 A.2d 1265, 1273 (1982), in turn quoting *Attorney Grievance Comm'n v. Kahn*, 290 Md. 654, 683, 431 A.2d 1336, 1352 (1981) and *Bar Ass'n of Balto. City v. Siegel*, 275 Md. 521, 528, 340 A.2d 710, 714 (1975)). The factors to be considered when determining the appropriate sanction for professional misconduct are well-settled. We recently restated them in *Paul*, 423 Md. at 284–86, 31 A.3d at 522–23:

"Of course, what the appropriate sanction for the particular misconduct is, in the public interest, generally depends upon

the facts and circumstances of the case. [*Attorney Grievance Comm'n v.]Snyder*, 406 Md. [21,] 30, 956 A.2d [147,] 152 [ (2008) ]; *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 375, 872 A.2d 693, 713 (2005); [*Attorney Grievance Comm'n v.] Babbitt*, 300 Md. [637,] 642, 479 A.2d [1372,] 1375 [ (1984) ] (the facts and circumstances of a case will determine the severity of the sanction); *Montgomery*, 296 Md. at 120, 460 A.2d at 600; *Attorney Grievance Comm'n v. Pollack*, 289 Md. 603, 609, 425 A.2d 1352, 1355 (1981). In that regard, in every case, we consider the nature of the ethical duties violated in light of any aggravating or mitigating circumstances. [*Attorney Grievance Comm'n v.] Sweitzer*, 395 Md. [586,] 598–99, 911 A.2d [440,] 447–48 [ (2006) ]. The attorney's prior grievance history, as well as facts in mitigation, constitute[ ] part of those facts and circumstances. *Maryland State Bar Ass'n v. Phoebus*, 276 Md. 353, 362, 347 A.2d 556, 561 (1975). We also look to our past cases involving attorney discipline when imposing sanctions. *Attorney Grievance Comm'n v. Thompson*, 376 Md. 500, 520, 830 A.2d 474, 486 (2003).

"To be sure, 'a persistent or more egregious course of conduct in violation of our disciplinary rules may lead to much more severe sanctions.' *Attorney Grievance Comm'n v. Weiss*, 300 Md. 306, 314, 477 A.2d 1190, 1194 (1984). We have also recognized that an attorney's voluntary termination of the misconduct, accompanied by an appreciation of the serious impropriety of that past conduct and remorse for it, is evidence that the attorney will not hereafter engage in such unethical conduct if permitted to continue practice. *Attorney Grievance Comm'n v. Freedman*, 285 Md. 298, 300, 402 A.2d 75, 76 (1979). The likelihood of repetition is a factor to be considered in determining the appropriate sanction. In *Freedman*, taking that factor into account resulted in a reprimand, rather than a suspension, as the Attorney Grievance Commission had urged. Of course, conduct that is an aberration can be so egregious as to warrant the imposition of a significant sanction. *Protokowicz*, 329 Md. at 263, 619 A.2d at 105 (1993). Our approach to

sanctioning attorneys is, thus, consistent with, and reflects, that recommended by American Bar Association's Standards for Imposing Lawyer Sanctions (ABA Standards). ABA Standards For Imposing Lawyer Sanctions 9.32 (1992); *See Attorney Griev. Comm'n v. Glenn*, 341 Md. 448, 488–89, 671 A.2d 463, 483 (1996). The four questions that ABA Standard 3.0, ABA Standards at 17, pose for the sanctioning court, *i.e.*, '(1) What is the nature of the ethical duty violated?; (2) What was the lawyer's mental state?; (3) What was the extent of the actual or potential injury caused by the lawyer's misconduct?; and (4) Are there any aggravating or mitigating circumstances?' mirror many of the considerations herein above enumerated. Standard 9.32 prescribes other factors, *id.* at 41–42, that we agree are relevant:

> 'Absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.' "

With regard to aggravating factors, we consider whether there are prior disciplinary offenses; whether the attorney acted with a dishonest or selfish motive; whether there is a pattern of misconduct; whether there are multiple offenses; whether there is "bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency"; whether there was a submission of false evidence, false statements, or other deceptive practices during the disciplinary process; whether the attorney refused to acknowledge the wrongful nature of conduct; the vulnerability of victim; whether the attorney has substantial experience in the practice of law; and whether he or she displayed indiffer-

ence to making restitution. Standard 9.22 of the American Bar Association Standards for Imposing Lawyer Sanctions.

■ The petitioner recommends that the respondent be suspended indefinitely from the practice of law. Acknowledging that the hearing judge expressly found that the respondent did not act to deceive or defraud and made substantial findings of mitigation, the respondent focuses on his other finding, that the petitioner acted unreasonably and in bad faith, and on the respondent's disciplinary history, on the basis of which, it urges that the aggravating factors in this case outweigh the favorable findings and the mitigating factors. It submits, referencing Standard 9.22 of the American Bar Association Standards for Imposing Lawyer Sanctions and citing *Attorney Grievance Comm'n v. Bleecker*, 414 Md. 147, 176–77, 994 A.2d 928, 945–46 (2010), in which this Court cited the Standards with approval, that the aggravating factors applicable in the case *sub judice* include the respondent's prior disciplinary history, that he engaged in a pattern of misconduct, in addition to the respondent's refusal to acknowledge the wrongful nature of the charges and the respondent's substantial experience in the practice of law. In support, the petitioner stresses what the hearing judge found, that, despite being "told over and over that he was not entitled to keep the funds associated with the lien" and in spite of the authorities with which he was presented, the respondent persisted in doing so "without adequate justification." The petitioner concludes: "This was not one mistake or even a series of mistakes. This was a consistent and persistent course of conduct that ignored the lien holder's rights to funds in the Respondent's possession."

■ As indicated, the petitioner relies on the respondent's prior disciplinary history, which it maintains "is very relevant to the sanction to be imposed." It argues, in that regard, that of the four prior sanctions, two of them "directly relate to his failure to honor a lien of a third party." The petitioner points out that the respondent has been reprimanded twice for violation of MLRPC 1.15, first in 1998, by private reprimand

on the direction of the Review Board, for failing to notify medical services providers that he had received funds in which they had an interest, and a year later, by this Court, pursuant to a Joint Petition for Reprimand by Consent, for failing to honor the lien of the compensation carrier in a Workers' Compensation matter. The respondent received another reprimand in 1983, this time for a violation of former DR7-102(B)(1) [12] by failing to have his client correct the record after giving testimony at a deposition that the respondent knew was false. *Attorney Grievance Comm'n v. Sperling,* 296 Md. 558, 565–66, 463 A.2d 868, 871 (1983). Finally, in 2004, the respondent was suspended indefinitely with the right to apply for reinstatement in ninety days. *Attorney Grievance Comm'n v. Sperling,* 380 Md. 180, 193, 844 A.2d 397, 405 (2004). In that case, which the petitioner submits "again involved his apparent myopia when it comes to the appropriate maintenance of other people's money," the respondent was found to have violated MLRPC Rules 1.15 and 8.4 and § 10–306 of the BOP Article. *Id.* at 183, 844 A.2d at 399.

The respondent responds that the petitioner's recommendation

> "is far more severe than warranted in light of the Findings of Fact made by the trial judge; far more severe than warranted when compared to the facts and sanctions involved in other decisions of this Court; and far more severe than is necessary to achieve the ultimate goal of these proceedings, to protect the public."

Acknowledging that his conduct was inappropriate, although, as found by the hearing judge, unintentional, that it violated the Rules of Professional Conduct and that a suspension would be an appropriate sanction, he recommends a 30 day suspension, rather than an indefinite one.

---

**12.** DR 7–102(B)(1) provided:

"A lawyer who receives information clearly establishing that:

"(1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal."

In support of his recommendation, the respondent emphasizes the purpose of attorney discipline, to protect the public and not to punish, and the hearing judge's mitigation findings. Specifically, he points to the findings that he did not act with a dishonest or selfish motive, negating one of the aggravating factors enumerated in Standards 9.22, on which we have relied, and that his intention always was to pass reductions he was able to achieve on to his clients.

The respondent concedes, as he must, his disciplinary record, in particular that he has been sanctioned for similar conduct in failing to pay third party liens promptly. Acknowledging that and the aggravating factors the petitioner identifies, including his failure, on multiple occasions, to accept the Fund's exercise of its right to refuse to waive its liens, he argues that the mitigation found by the hearing judge outweighs the aggravating factors on which the petitioner relies. In addition to the lack of a dishonest, fraudulent or nefarious motive, he points to the hearing judge's finding that his MLRPC 8.4(d) violation did not involve misappropriation of client funds, the misuse of trust funds or the commingling of client funds, misconduct for which an indefinite suspension has been ordered, citing *Attorney Grievance Comm'n v. Zuckerman*, 403 Md. 695, 715–16, 944 A.2d 525, 537–38 (2008); *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 386, 872 A.2d 693, 720 (2005); and *Attorney Grievance Comm'n v. Santos*, 370 Md. 77, 89, 803 A.2d 505, 512 (2002).

In addition, the respondent emphasizes two other mitigating factors that the hearing judge found, his remorse, that he "recognizes his errors in both cases, and deeply regrets and is truly remorseful for his conduct," and his full and complete cooperation with Bar Counsel in the matter. Finally, the respondent relies on a change in his practice that triggers, after 60 days, the filing of an interpleader action when third party liens have not been resolved.

There is merit in each of the parties' recommendations. That the respondent has previously been sanctioned for similar misconduct and yet engaged in that conduct again, on this

occasion prompting the hearing court to characterize his persistent and continuing pursuit of his untenable goal as "unreasonable and made in bad faith," is deeply troubling. It is also significant that one of the prior disciplinary proceedings in which the respondent was found to have violated MLRPC 1.15 resulted in the respondent being sanctioned with an indefinite suspension, albeit with a specified minimum "sit-out" period after which reinstatement could be sought. That sanction alone militates against acceptance of the respondent's recommendation of a "brief suspension of thirty days." Indeed, to adopt the respondent's recommendation, in view of a prior indefinite suspension involving similar misconduct as found in this case, would be inconsistent in that he would be receiving a lesser sanction for subsequent similar misconduct.

■ On the other hand, the purpose of the disciplinary process and the mitigation findings made by the hearing judge cannot be disregarded. But for the latter, the respondent's conduct would represent "a persistent or more egregious course of conduct in violation of our disciplinary rules [which] may lead to much more severe sanctions." *Attorney Grievance Comm'n v. Weiss*, 300 Md. 306, 314, 477 A.2d 1190, 1194 (1984). Despite being aware of the respondent's inadequately supported persistent and continued conduct in the face of the adequate factual and legal justifications for its actions offered by the Fund and characterizing it, after a time as "unreasonable and in bad faith," however, the hearing judge found that the respondent did not act dishonestly, fraudulently or with a "nefarious motive" in pursuing a reduction of the Fund's liens. He also found the respondent's remorse genuine, although aware of the respondent's grievance history—he presided over the case in which the respondent was indefinitely suspended—and the similarity of some of the past sanctioned conduct to the charged conduct *sub judice*. We have said that appreciation of, and remorse for, the serious impropriety of past conduct is evidence that the attorney will not thereafter engage in such unethical conduct if permitted to continue practice, a factor to be considered in determining the appropriate sanction. *Paul*, 423 Md. at 285, 31 A.3d at 522;

*Attorney Griev. Comm'n v. Freedman*, 285 Md. 298, 300, 402 A.2d 75, 76 (1979). Moreover, the hearing judge expressly found that the clients were not harmed, the Fund was paid from the respondent's personal funds, and that steps were now in place to avoid a repetition of this scenario.

On balance, in light of the mitigation findings, giving effect to the purpose of attorney discipline, we believe the appropriate sanction is, as the petitioner recommends, an indefinite suspension; however, the respondent may apply for reinstatement after a minimum "sit-out" period of six months. The sanction shall be effective thirty days from the date of this opinion.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–671(b), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST LEONARD J. SPERLING.