2016 VT 94

**In re PRB DOCKET NO. 2016-042**

[154 A.3d 949]

No. 16-259

¶ 1. August 24, 2016. Upon review of the hearing panel decision in this matter, the Court concludes as follows: The decision presents a well-reasoned discussion and resolution of a problem common in legal practice, particularly for small firms and solo practitioners. Accordingly, the Court orders review of the decision on its own motion, adopts the hearing panel decision in its entirety as a final order of this Court, waives briefing and oral argument, and orders that the decision be published in the Vermont Reports.

**STATE OF VERMONT PROFESSIONAL RESPONSIBILITY BOARD**

In re PRB File No. 2016-042

Decision No. *198*

The Hearing Panel hereby approves Respondent receiving a private admonition from Disciplinary Counsel for violation of Rules 1.15(a), 5.3(a) and 5.3(b) of the Vermont Rules of Professional Conduct, as Respondent failed to maintain proper control and oversight of his client trust accounts.

Hearing Panel No. 10, consisting of Joseph J. O'Dea, Esq., Chair, Jonathan M. Cohen, Esq. and Mr. Roger Preuss, has received and considered Disciplinary Counsel's and Respondent's written submissions. Disciplinary Counsel and Respondent jointly requested that this disciplinary matter be resolved by private admonition by Disciplinary Counsel. Based upon the parties' submissions, including the Stipulation of Facts, Joint Recommendation for Conclusions of Law, Disciplinary Counsel's Sanction Memorandum, letters of support submitted on Respondent's behalf, and Joint Recommendation for Admonition by Disciplinary Counsel, the Hearing Panel makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Respondent is an attorney licensed to practice law in Vermont and New Hampshire. He was admitted to the New Hampshire bar in 1972 and the Vermont bar in 2000. Respondent currently works as a sole practitioner. Respondent maintains an office in New Hampshire, but represents clients in both Vermont and New Hampshire. His practice is focused on business law, commercial transactions, business litigation, and real estate transactions.

In 1991, Respondent joined a New Hampshire law firm and was assigned to the firm's new satellite office. Respondent hired a nonlawyer employee to work with him. Respondent knew the employee prior to hiring her, as the employee had worked for Respondent's wife for five years, prior to Respondent's and his wife's marriage. The employee's work for Respondent's wife was highly regarded.

For the first nine years the employee worked with Respondent, the employee did not handle money or Respondent's office accounts because those tasks were handled by staff at the law firm's main office. Respondent found the employee to be smart and capable. During their years working together, Respondent and the employee became personal friends.

In 2000, Respondent left the law firm, established his own office, and began working as a solo practitioner. Respondent hired the employee to work for him in his new office.

At the new office, Respondent assigned the employee some new duties, including handling Respondent's operating account and client trust accounts.[1] (Respondent maintained client trust accounts in New Hampshire and Vermont.) Respondent would make all of the bank deposits himself, and confirm the deposits were recorded in his QuickBooks accounting system. Respondent's employee was responsible for all of the other bookkeeping tasks associated with Respondent's accounts. For example, the employee opened the monthly bank statements and performed the monthly reconciliations for each account, including the client trust accounts.

Respondent performed some limited oversight of his client trust accounts.[2] At the end of each month, the employee prepared a ledger report for each client's trust account, showing all deposits to and withdrawals from each client's trust account. Each ledger report also stated the balance for each client's trust account as of the end of the month. Each month, Respondent reviewed the employee's ledger reports for each client's trust account. The employee's ledger reports showed the client's respective trust accounts were

[1] As a matter of convenience, the terms "IOLTA account" and "client trust account" will be used interchangeably to refer to any bank account holding client funds.

[2] Lawyers' IOLTA and trust accounts involve a bank account, holding money for one client or for multiple clients. Technically, it may be more appropriate to refer to a client's funds held in an IOLTA account as a "subaccount." As a matter of convenience, however, a client's funds held by a lawyer in trust shall be referred to as a client trust account, regardless of whether that money is held in a bank account containing only one client's money, or an IOLTA account holding money for several clients.

in balance and there were no problems with the accounts. When Respondent concluded work on a client's matter, the client's trust account would be reduced to zero by payment of outstanding fees and costs, and by refunding the unexpended balance to the client. After final disbursement from the client trust account, the employee prepared a final ledger report for the client's trust account for Respondent's review. Respondent always reviewed the employee's final ledger report to confirm that the client's trust account showed a zero balance.

Annually, Respondent hired an outside certified public accountant (CPA) to review his financial records and prepare his tax returns. The CPA's work included a review of all of Respondent's QuickBooks entries. The CPA never brought any issues to Respondent's attention concerning Respondent's accounts or financial records.

Respondent's title insurance company periodically reviewed Respondent's IOLTA accounts and, it appears, the title insurance company never discovered any irregularities.

Respondent did not implement or follow reasonable procedures to safeguard client funds while he worked as a sole practitioner. Respondent did not personally review the monthly bank statements or cancelled checks. Respondent did not review his employee's monthly account reconciliations. Respondent's oversight was limited to reviewing the ledger reports prepared by his employee. Had Respondent compared the employee's ledger reports against the corresponding bank statements, Respondent would have discovered significant discrepancies, as the information recorded in his QuickBooks accounting system did not match the transactions reported in corresponding bank statements.

Unbeknownst to Respondent, the employee was engaged in an embezzlement scheme, and was periodically taking

money from Respondent's operating account. The employee used different techniques to embezzle money from the operating account. For example, the employee wrote checks payable to herself, forged Respondent's signature on the checks, and cashed the checks. The employee did not record these checks in QuickBooks, but she would reduce the amount of a deposit previously recorded in QuickBooks by the amount of the check she had just written to herself. Following this procedure, the QuickBooks accounts always appeared to be in balance. The employee would also write checks payable to herself and record the checks in QuickBooks as payment of an office expense, thereby disguising her theft as a business expense.

During the course of her employment, the employee engaged in one instance of embezzling money from Respondent's client trust account. In November 2014, the employee wrote one trust account check, payable to herself, in the amount of $2020.18, and forged Respondent's signature on the check. The employee recorded the check in QuickBooks, falsely designating "Capitol One" as the payee.

In January 2015, Respondent needed to pay his fourth quarter estimated taxes. To make the payment, Respondent tried to transfer funds from his operating account, but the transfer failed due to insufficient funds. Respondent went to the bank to look into the matter and discovered his employee's unauthorized withdrawals from his operating account. Respondent was in disbelief that his trusted employee, with twenty-four years of service, had stolen money from him. Respondent felt completely betrayed.

Respondent immediately terminated the employee. Respondent hired an experienced paralegal to take over the former employee's duties. Respondent promptly notified law enforcement about the em-

bezzlement.[3] Respondent asked the CPA firm that annually prepared his tax returns to examine all of his accounts and financial records. Respondent also engaged the services of the CPA firm's forensic specialist to do a specialized review. Law enforcement and Respondent's title insurance company conducted their own examinations of Respondent's accounts and financial records. All of Respondent's financial records for his operating accounts and his client trust accounts were thoroughly examined.

The investigations revealed a substantial sum of money was missing from Respondent's operating account, but no money appeared to be missing from Respondent's client trust accounts. Respondent self-reported the embezzlement to Vermont Disciplinary Counsel, out of an abundance of caution and a desire for transparency.

In August 2015, Disciplinary Counsel selected Respondent's Vermont client trust account for a compliance examination. Once notified of the upcoming examination, Respondent and his paralegal re-reviewed the records for his client trust account. Respondent discovered his former employee had written a check to herself in November 2014 for $2020.18, as described above. On discovering the misappropriation, Respondent immediately transferred money from his operating account to the client trust account, to cover the loss caused by the misappropriation of funds. Respondent also reported the misappropriation of client funds to Disciplinary Counsel.

In September 2015, Disciplinary Counsel's CPA completed the compliance ex-

---

[3] The former employee was prosecuted in federal court for taking money from Respondent's operating account and convicted of mail fraud. The federal court sentenced the former employee to 36 months in prison and ordered her to pay approximately $903,000 in restitution.

amination of Respondent's Vermont IOLTA account. The CPA found no evidence that the former employee had misappropriated funds from Respondent's client trust account, excepting only the one check for $2020.18 written in November 2014. The CPA informed Disciplinary Counsel that Respondent's Vermont IOLTA account was used solely for Vermont real estate closings and refinances. Respondent averaged about two Vermont closings per month and, typically, the Vermont trust account did not carry a substantial balance. Respondent's title insurance company periodically reviewed Respondent's IOLTA account, and his former employee knew the title insurance company was conducting these reviews. In the CPA's opinion, the risk of a substantial misappropriation of client funds from Respondent's Vermont IOLTA account was low.

In response to the defalcation, Respondent implemented internal controls to assure the safekeeping of client funds held in his trust accounts. On a monthly basis, Respondent personally reviewed the bank statements for both his operating account and his client trust accounts. Each month Respondent would either personally reconcile his bank statements or closely review the reconciliations performed by his paralegal.

Respondent did not intend for his former employee to embezzle client money from his Vermont trust account, nor did he know that she had done so. Respondent's mental state was one of negligence. The degree of Respondent's negligence is shown, in part, by the fact the employee repeatedly embezzled money from Respondent's operating account, over a period of many years, without being discovered. The former employee embezzled a total of about $962,000 from Respondent's operating account. (It must be emphasized that Respondent's operating account only held Respondent's money, not client money, and whatever losses Respondent suffered as a result of the thefts from his operating account were his alone.)

The injury suffered in this case is limited to the $2020.18 of client funds, which Respondent refunded with his own money once he discovered client money had been misappropriated. The potential for injury was not insignificant, as suggested by the employee's repeated thefts from Respondent's operating account over many years. The potential for injury is also shown by the fact that Respondent, the CPA, the forensic specialist, and law enforcement all reviewed his trust accounts looking for irregularities, but found none. This fact suggests money could have been misappropriated from the trust account without being discovered.

The potential for injury, however, was mitigated by several factors. Typically, Respondent's Vermont trust account did not maintain a substantial balance. Client funds held in Respondent's trust account were earmarked for specific purposes (i.e., mortgage payoffs, filing fees and other closing costs), making an attempted embezzlement more obvious, and therefore, less likely. The former employee was also aware that Respondent's title insurance company was periodically reviewing Respondent's client trust accounts, thereby discouraging theft of client funds. Disciplinary Counsel's CPA assessed the risk of potential for injury as low.

Respondent submitted letters of support to the Hearing Panel from two Vermont attorneys, from Respondent's banker, and from a man who was both Respondent's client and rabbi. The tenor of the letters is that Respondent is a man of integrity, who adheres to the highest professional and ethical standards. One of the attorneys stated that Respondent is conscientious and attends to details when representing a client. The letter submitted by Respondent's banker attested to Respondent's thoroughness and skill. The banker stated that Respondent's "efforts

and competencies in the legal aspects of Real Estate transactions have greatly benefited [the bank and its] clients." Respondent's rabbi stated that, as a rabbi and client, he trusted Respondent's skill and judgment in matters both legal and nonlegal. The letters emphasize that Respondent is the victim of his former employee's callous wrongdoing.

## II. CONCLUSIONS OF LAW

### A. Applicable Legal Standards

"In general, the [Rules of Professional Conduct] are 'intended to protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar.'" *In re PRB Docket No. 2006-167*, 2007 VT 50, ¶ 9, 181 Vt. 625, 925 A.2d 1026 (mem.) (quoting *In re Berk*, 157 Vt. 524, 532, 602 A.2d 946, 950 (1991) (per curiam)); accord *In re PRB Docket No. 2006-167*, 2007 VT 50, ¶ 9 (although *Berk* referred particularly to sanctions, it is clear that these are the overarching goals of the rules).

The Hearing Panel's findings as to each element of a charge of professional misconduct must be supported by clear and convincing evidence. A.O. 9, Rule 16(C); *In re McCarty*, 2013 VT 47, ¶ 12, 194 Vt. 109, 75 A.3d 589 ("All formal charges of misconduct 'shall be established by clear and convincing evidence.'"). "The burden of proof in proceedings seeking discipline or transfer to disability inactive status is on disciplinary counsel." A.O. 9, Rule 16(D).

If a violation of the Rules of Professional Conduct is proved by clear and convincing evidence, one or more sanctions may be imposed. A.O. 9, Rule 8. The purpose of sanctions is not "'to punish attorneys, but rather to protect the public from harm and to maintain confidence in our legal institutions by deterring future misconduct.'" *In re Obregon*, 2016 VT 32, ¶ 19, 201 Vt. 463, 145 A.3d 226 (quoting *In re Hunter*, 167 Vt. 219, 226, 704 A.2d 1154, 1158 (1997)); see also *In re Neisner*, 2010 VT 102, ¶ 24, 189 Vt. 145, 16 A.3d 587.

### B. Violation of Rules of Professional Conduct

#### 1. Rule 5.3(a)

Rule 5.3 of the Vermont Rules of Professional Conduct governs a lawyer's responsibilities regarding nonlawyer assistants. Rule 5.3 responsibilities extend to the supervision of a nonlawyer assistant who handles funds held in a trust account. See V.R.Pr.C. 5.3, Comment [2]. The Annotated Model Rules of Professional Conduct provide:

> Lawyers are responsible under Rule 5.3 for the mishandling of client funds by non-lawyer assistants. Courts view holding money in trust for clients as a nondelegable fiduciary responsibility that cannot be excused by someone else's ignorance, inattention, incompetence, or dishonesty. Although lawyers may employ nonlawyers to assist in fulfilling this fiduciary duty, lawyers must provide adequate training and supervision to ensure that ethical and legal obligations to account for client funds are being met. When it comes to handling client funds, "there must be some system of timely review and internal control to provide reasonable assurance that the supervising lawyer will learn whether the employee is performing the delegated duties honestly and competently." *In re Cater*, 887 A.2d 1 (D.C. 2005).

Annotated Model Rules at 450.[4]

Rule 5.3(a) of the Vermont Rules of Professional Conduct provides that a law-

---

[4] The Model Rules of Professional Conduct are available online at http://www.american bar.org/groups/professional_responsibility/ publications/model_rules_of_professional _conduct/model_rules_of_professional_con duct_table_of_contents.html

yer "shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the [nonlawyer] person's conduct is compatible with the professional obligations of the lawyer." The Comments explain: "Paragraph (a) requires lawyers . . . make reasonable efforts to establish internal policies and procedures designed to provide reasonable assurance that nonlawyers in the firm will act in a way compatible with the Rules of Professional Conduct." V.R.Pr.C. 5.3 Comment [2]. Accordingly, a solo practitioner, or a lawyer in a firm with managerial responsibilities has a duty to assure that the law practice has policies and procedures in place to assure nonlawyer employees adhere to the standards established by the Rules of Professional Conduct.

Here, Respondent had his nonlawyer employee handle client money without having policies and procedures in place to assure client funds were safeguarded. Respondent's procedures were minimal, and lacked the internal controls needed to assure no one person had absolute control over client funds and the bookkeeping related thereto. Once the employee's embezzlement scheme was uncovered, Respondent adopted a system of internal control, including: (a) Respondent personally reviewing bank statements on a monthly basis; and (b) Respondent personally reconciling his bank statements, or closely reviewing reconciliations performed by his paralegal. Respondent's failure to implement a reasonable system of internal controls constitutes a violation of Rule 5.3(a). See *In re Anonymous*, 876 N.E.2d 333 (Ind. 2007) (lawyer's failure to have systems in place to safeguard client funds constituted a violation of Rule 5.3(a)); *Curtis v. Kentucky Bar Ass'n*, 959 S.W.2d 94 (Ky. 1998) (lawyer's failure to have proper procedures in place to protect client funds constituted a violation of Rule 5.3(a)); *Attorney Grievance Commission v. Zuckerman*, 944 A.2d 525 (Md.

2008) (lawyer's failure to have appropriate policies in place to protect client funds constituted a violation of Rule 5.3(a)).

## 2. Rule 5.3(b)

Rule 5.3(b) of the Vermont Rules of Professional Conduct states a lawyer having direct supervisory authority over a nonlawyer employee "shall make reasonable efforts to ensure that the [employee's] conduct is compatible with the professional obligations of the lawyer." V.R.Pr.C. 5.3(b). So, in addition to putting policies in place, lawyers are required to supervise their nonlawyer employees so that the nonlawyer employees comply with the Rules of Professional Conduct. *Id.* As explained in the Annotated Model Rules, "a lawyer may not turn over the day-to-day operations of a law office — or any discrete part of it, such as its bookkeeping functions — without continuous scrutiny of those operations." Annotated Model Rules at 453. The commentary to Rule 5.3 explains:

> Lawyers generally employ assistants in their practice . . . . Such assistants . . . act for the lawyer in rendition of the lawyer's professional services. A lawyer must give such assistants appropriate instruction and supervision concerning the ethical aspects of their employment . . . and should be responsible for their work product. The measures employed in supervising nonlawyers should take account of the fact that they do not have legal training and are not subject to professional discipline.

V.R.Pr.C. 5.3 Comment [1].

The lawyer's duty to supervise the conduct of nonlawyer employees is well recognized. In *In re Joiner* the Louisiana Supreme Court explained:

> A seminal case addressing this issue is *Louisiana State Bar*

*Ass'n v. Keys*, 567 So. 2d 588 (La. 1990). In *Keys*, the lawyer was representing a succession and established a checking account for succession funds. Without the lawyer's knowledge, his secretary removed funds from the succession account and transferred them to an operating account. Upon learning of the withdrawals, the lawyer reimbursed the funds prior to the filing of the complaint. In our opinion, we agreed that the lawyer was unaware of his secretary's actions. Nonetheless, citing DR 9-102 (the predecessor provision to Rule 1.15), we found the lawyer was negligent in failing to establish adequate procedures for handling client funds:

> While respondent did not know of the misuse of the funds in the present case at a time when the consequences could have been avoided, his negligence in failing to establish adequate procedures for handling the client's funds resulted in the commingling of the client's funds with those of the attorney and the use of the client's funds for the attorney's personal purposes. *Perhaps an attorney may blindly trust an employee with his own funds, but the attorney who undertakes to handle a client's funds has the duty to take reasonable steps to safeguard the funds.* Here, respondent's duty under DR 9-102 to safeguard the funds of a client included the duty of rea-

sonable supervision of the nonlawyer employee who actually handled the funds. Respondent failed to instruct his employee on the concept of escrow accounts and failed to check periodically the handling of the funds held in escrow. Respondent's supervisory failures over a long period of time created a fertile environment for his employee's misuse of the funds.

*Id.* at 592 (emphasis added).

The reasoning of *Keys* is particularly appropriate under the facts of the case at bar. Although respondent may have been victimized by his assistant's improper actions, the ethical rules and jurisprudence of this court impose an overarching duty on the lawyer to safeguard the funds of the lawyer's clients. As in *Keys*, respondent's failure to supervise his assistant created a fertile environment for her embezzlement. Respondent's actions clearly constitute negligent violations of Rule 5.3 and Rule 1.15.

2015959-B-0, 2015 WL 8225728, at *5-6 (La. Dec. 8, 2015) (emphasis added); accord *In re Otlowski*, 976 A.2d 172, 2009 WL 1796083, at *4 (Del. June 23, 2009) (unpub.) ("By . . . failing to supervise his employee(s) generally with respect to compliance with the Rules and specifically regarding safeguarding of escrow funds, the Respondent violated Rule 5.3."); see also *In re Martin*, 163 Vt. 633, 634, 660 A.2d 300, 302 (1995) (mem.) ("[R]espondent's misconduct was due to his gross negligence in turning over financial matters to a bookkeeper without proper oversight.").

Here, Respondent delegated responsibility for the handling of client money to his nonlawyer employee, but did not provide appropriate oversight. Respondent implemented a system of internal controls only after he discovered his employee had embezzled funds from his operating account. Respondent's failure to supervise his employee constitutes a violation of Rule 5.3(b). See *In re Anonymous*, 876 N.E.2d 333 (Ind. 2007) (lawyer's failure to supervise wife's handling of client funds constituted a violation of Rule 5.3(b)); *Curtis v. Kentucky Bar Ass'n*, 959 S.W.2d 94 (Ky. 1998) (lawyer failed to supervise his bookkeeper, who wrote a client trust account check to buy a personal pet); *Attorney Grievance Commission v. Zuckerman*, 944 A.2d 525 (Md. 2008) (lawyer failed to supervise two employees, both of whom embezzled substantial sums from client trust account); see also *In re Kaszynski*, 620 N.W.2d 708 (Minn. 2001) (failure to supervise employee who embezzled violated Rule 5.3); *In re Cater*, 887 A.2d 1 (D.C. 2005) (failure to supervise employee who embezzled violated Rule 5.3(b)); *State ex rel. Oklahoma Bar Ass'n v. Mayes*, 977 P.2d 1073 (Okla. 1999) (failure to supervise embezzling employee violated Rules 5.3(a), 5.3(b), and 5.3(c)); *In re Marshall*, 498 S.E.2d 869 (S.C. 1998) (failure to supervise embezzling employee violated Rule 5.3 and Rule 1.15); *In re Ponder*, 654 S.E.2d 533 (S.C. 2007) (failure to supervise embezzling employee violated Rules 5.3(a), (b), and (c), and Rule 1.15(a)); *In re Shamers*, 873 A.2d 1089 (Del. 2005) (failure to supervise embezzling employee violated Rule 5.3 and Rule 1.15).

### 3. Rule 1.15

Rule 1.15 of the Vermont Rules of Professional Conduct is entitled "Safekeeping Property." Rule 1.15(a) requires lawyers to hold property belonging to clients or third persons separate from the lawyer's own property, and in accordance with Rules 1.15A and 1.15B. The Comment to the rule states: "A lawyer should hold property of others with the care required of a professional fiduciary." Rule 1.15(a) Comment [1]. To meet this duty, a lawyer "should maintain on a current basis books and records in accordance with generally accepted accounting practice." *Id.* Failure to take reasonable steps to protect client funds held by a lawyer in trust constitutes a violation of Rule 1.15(a). See *In re Martin*, 163 Vt. at 634, 660 A.2d at 302 (lawyer sanctioned for failing to properly supervise nonlawyer employee who engaged in a pattern of embezzlement over several years.); see also *In re Anonymous*, 876 N.E.2d 333 (Ind. 2007) (failure to supervise employee who embezzled funds constituted violation of Rules 5.3 and 1.15(a)); *In re Marshall*, 498 S.E.2d 869 (S.C. 1998) (failure to supervise employee, resulting in employee embezzling client funds, constitutes a failure to safeguard client property pursuant to Rule 1.15); *In re Ponder*, 654 S.E.2d 533 (S.C. 2007) (failure to supervise employee who embezzled funds constitutes a failure to safeguard client property pursuant to Rule 1.15).

Here, Respondent did not adopt reasonable internal controls to protect client funds. Respondent did not supervise his employee by personally reviewing and reconciling bank statements, or closely reviewing the employee's bank reconciliations. Respondent's errors and omissions were serious in that they put client funds at risk, and, in fact, some were misappropriated. Accordingly, Respondent's failure to safeguard client property constitutes a violation of Rule 1.15(a).

Based on the stipulated facts submitted by Disciplinary Counsel and Respondent, there is clear and convincing evidence that Respondent violated Rules 1.15, 5.3(a) and 5.3(b) of the Vermont Rules of Professional Conduct. The violations found are solely related to Respondent

handling of client funds and his client trust account.[5]

## C. Applicability of the ABA Standards for Imposing Lawyer Sanctions

The Vermont Supreme Court has ruled:

> When sanctioning attorney misconduct, we have adopted the ABA Standards for Imposing Lawyer Discipline which requires us to weigh the duty violated, the attorney's mental state, the actual or potential injury caused by the misconduct, and the existence of aggravating or mitigating factors.

*In re Andres*, 2004 VT 71, ¶ 14, 177 Vt. 511, 857 A.2d 803 (mem.); accord *In re Blais*, 174 Vt. 628, 817 A.2d 1266 (2002) (mem.). Accordingly, the Hearing Panel employed the ABA Standards as a tool to determine the appropriate sanction to impose in Respondent's case.

### 1. The Duty Violated

A lawyer owes certain duties to his clients, including the duty to preserve client property. V.R.Pr.C. 1.15; see also ABA Standards § 4.1. Respondent failed to take reasonable and appropriate action to protect client property. Respondent failed to adopt policies and procedures to protect client's funds held in trust, thereby violating V.R.Pr.C. 5.3(a). Respondent failed to supervise his employee's handling of his client trust accounts.

---

[5] Respondent's handling of his operating account is useful background information, providing insight into how he managed his client trust accounts, and the potential for injury posed by his conduct. Whether Respondent's handling of his operating conduct should be the subject of disciplinary action is beyond the scope of the charge presented and, accordingly, beyond the scope of the Hearing Panel's review.

Respondent did not personally review bank statements or perform bank reconciliations. Respondent did not review his employee bank reconciliations carefully. Respondent's failure to carry out internal controls and supervise his employee's work resulted in $2020.18 of client funds being misappropriated. Respondent's failure to supervise his employee constitutes a violation of Rule 5.3(b).

### 2. Mental State

The second factor to be considered under the ABA Standards is the lawyer's mental state. ABA Standards § 3.0. The ABA Standards explain the relevant mental states as follows:

> The most culpable mental state is that of intent, when the lawyer acts with the conscious objective or purpose to accomplish a particular result. The next most culpable mental state is that of knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result. The least culpable mental state is negligence . . . .

ABA Standards, Theoretical Framework § II, at 6.

Respondent had no intent to embezzle client funds, and in no way benefited from his employee's criminal conduct. Respondent had no knowledge that his employee was engaged in an embezzlement scheme. Respondent's personal and professional relationship with the employee, and Respondent's wife's prior relationship with the employee, blinded Respondent to the fact that the employee was capable of embezzling funds on a grand scale. While Respondent had some systems in place, such as making the bank deposits himself and confirming deposits were recorded in QuickBooks, Respond-

ent's procedures were seriously flawed due to a lack of internal controls and proper oversight. Accordingly, the clear and convincing evidence of record establishes that Respondent's mental state was one of negligence.

### 3. Injury & Potential Injury

The ABA Standards next require a review of the injury and potential injury that may have resulted from the attorney's professional misconduct.

Respondent's lack of internal controls and oversight resulted in $2020.18 of client funds being misappropriated from his client trust account. There was no actual injury to a client because Respondent promptly deposited his own money into the trust account to cover the loss. Respondent's client trust account was short by $2020.18 for a period of time; there is, however, no evidence that the shortfall caused any client actual injury. The only person to suffer actual injury was Respondent, as he used his own funds to make the client trust account whole.

As for potential injury, the lack of internal controls and appropriate supervision put client funds at risk. The employee could have misappropriated more client money than was actually taken, as evidenced by the employee's pattern of embezzling funds from the operating account. The client money ($2020.18) the employee misappropriated from the trust account evaded discovery by law enforcement, Respondent's CPA, and the forensic specialist, all of whom were tasked with finding defalcation. Respondent only found the theft when he re-reviewed his trust in preparation for a trust account audit.

Disciplinary Counsel's CPA opined that the risk of injury was low. Respondent conducted one or two real estate closings or refinances each month, so the trust account usually held a minimal balance. Respondent's employee understood that funds held in the trust account were earmarked for particular expenses, making it difficult to disguise a theft from the account. Respondent's employee also knew that the title insurance company periodically reviewed the trust accounts. Clear and convincing evidence establishes that there was a potential for injury, but risk posed was low.

### 4. Presumptive Sanction under the ABA Standards

Section 4.1 of the ABA Standards describes the sanctions that apply when a lawyer fails to preserve client property. When the lawyer's mental state is one of negligence, the ABA Standards state there are two possible presumptive sanctions, being:

> § 4.13 Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.

> § 4.14 Admonition is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client.

In Respondent's case, the evidence establishes there was a potential for injury. Disciplinary Counsel's CPA stated there was a potential for injury, but the risk was low. As there was some potential for injury, § 4.13 applies, rather than § 4.14, and reprimand is the presumptive sanction.

### 5. Aggravating & Mitigating Factors

#### a. Aggravating Factors

In this case, there is one aggravating factor. Respondent has substantial experience in the practice of law. ABA Standards § 9.22(i). Respondent has practiced law for more than 40 years.

## b. Mitigating Factors

Section 9.32 of the ABA Standards sets forth a list of mitigating factors. There are substantial mitigating factors present in Respondent's case.

During Respondent's four plus decades of practicing law, Respondent has never been subject to disciplinary action. ABA Standards § 9.32(a).

Respondent had no selfish or dishonest motive for failing to enact reasonable internal controls over his client trust accounts, or his failure to supervise his employee. *Id.* § 9.32(b). Respondent did not know his employee was embezzling funds and did not benefit from her illegal conduct. Respondent did not condone his employee's unlawful conduct. *Id.*

When Respondent discovered his employee had misappropriated client funds, Respondent immediately used his own money to make his client trust account whole, and reported the misappropriation to Disciplinary Counsel. ABA Standards § 9.32(d). Respondent also took timely action "to rectify the consequences" of his employee's actions. Respondent hired both his CPA and a forensic specialist, at his own expense, to review all of his accounts to determine the nature and scope of the theft. See *id.*

Respondent self-reported the violation to Disciplinary Counsel. During Disciplinary Counsel's investigation, Respondent made full and free disclosure of all relevant facts to Disciplinary Counsel. Respondent also cooperated fully with both Disciplinary Counsel and the Hearing Panel during these disciplinary proceedings. ABA Standards § 9.32(e).

Clear and convincing evidence establishes that Respondent enjoys an excellent reputation and good character. ABA Standards § 9.32(g). The letters Respondent submitted show that he is respected by his peers in the profession, his clients and other professionals. Moreover, Respondent's reaction to the embezzlement

is precisely what the rules expect of a lawyer. Respondent's forthright response to the events and underlying circumstances, including the remedial measures he voluntarily put in place, is clear and convincing evidence of Respondent's good character. See *In re PRB Docket No. 2012.155*, 2015 VT 57, ¶ 23, 199 Vt. 143, 121 A.3d 675.

Respondent is genuinely remorseful that he did not effectively manage his client trust accounts. See ABA Standards § 9.32(l). Respondent converted his remorse into action by willingly changing his bookkeeping procedures and implementing a system of internal controls to safeguard client funds.

### c. Mitigating Factors Outweigh Aggravating Factors

The presumptive sanction in this matter is a public reprimand. There are, however, substantially mitigating factors that outweigh the one aggravating factor present in this case.

The actual injury in this case was limited to one instance of theft of client funds, in the sum of $2020.18. The loss did not cause the client actual harm as Respondent promptly covered the loss with his own funds. The potential for substantial injury to a client, as Disciplinary Counsel's CPA opined, was low. Respondent acted immediately and effectively, to address the theft of funds, bringing in financial experts, and reporting the theft to law enforcement and Disciplinary Counsel. On discovering the misappropriation of client funds, Respondent made a second report to Disciplinary Counsel. Respondent then voluntarily implemented internal controls in his accounting procedures to assure client funds were properly safeguarded.

In the matter of *In re PRB Docket No. 2012.155*, the Vermont Supreme Court reviewed a disciplinary matter involving a lawyer who deposited personal funds into a client trust account and then kept a

separate ledger of the lawyer's funds. 2015 VT 57. The lawyer was cited for commingling his funds with client funds in his client trust account. *Id.* The Court gave great weight to the attorney's efforts to rectify the error when considering the appropriate sanction to impose. The Court wrote:

> As Disciplinary Counsel recognized, attorney took additional affirmative steps in hiring a CPA at his own expense, ordering bank and court records, and diligently tracking every irregularity going back to the opening of his IOLTA account in 1997. His personal investigation far exceeded that of Disciplinary Counsel, resulting in details of violations and irregularities that Disciplinary Counsel would not have uncovered. He disclosed far more information than was required, including several bookkeeping errors and other irregularities that already had been remedied. Attorney's extensive efforts go beyond what was required of him and weigh heavily in our consideration of mitigating factors.

*Id.* ¶ 23. Like the lawyer in *In re PRB Docket No. 2012.155*, Respondent did everything expected of him to discover the full extent of the losses caused by his employee's illegal conduct, and reported the thefts to Disciplinary Counsel.

It must be acknowledged that Respondent was also the victim of a serious crime. His employee misappropriated $962,000 from his law practice over the course of several years. From the record, it cannot be determined if Respondent's losses, or any part thereof, were covered by insurance. The parties stipulated, however, that Respondent personally reimbursed his client trust account, and personally paid for the CPA's and forensic

specialist's reviews of his accounts. It is also clear that Respondent diverted a substantial amount of his time and resources from serving clients to addressing his employee's criminal conduct and putting his practice back on a solid footing.

There is limited Vermont precedent available to provide guidance on the appropriate sanction. The case of *In re Martin* is somewhat similar to the facts of Respondent's case. 163 Vt. 633, 660 A.2d 300 (1995). In *Martin* the lawyer hired an office manager, who, for many years, handled all aspects of the firm's financial affairs. Unbeknownst to the lawyer, his office manager used her position to embezzle money from both the firm's operating account and client trust account. *Id.* The disciplinary board concluded, and the Vermont Supreme Court concurred, public reprimand was the appropriate sanction. *Id.* at 635, 660 A.2d at 302 (public reprimand imposed for violation of DR 9-102). Although the *Martin* case was decided under the former Code of Professional Conduct, the case is instructive.

In *Martin* the lawyer's office manager served in her position for many years and the lawyer placed enormous trust in her. *Id.* at 633-34, 660 A.2d at 301. The lawyer did not personally review any of the firm's financial accounts or supervise the office manager's work. *Id.* The Internal Revenue Service (IRS) notified the lawyer that the lawyer owed $10,000 in unpaid federal payroll taxes. *Id.* The office manager assured the lawyer that the back taxes would be paid. *Id.* The lawyer took the office manager at her word and did nothing further. *Id.* Three years later, the IRS notified the lawyer the debt for unpaid taxes had grown to $40,000. *Id.* The lawyer continued to trust his office manager and did not investigate the source of the tax delinquency. The following year, the lawyer discovered his officer manager had embezzled $130,000 from his operating and client trust accounts. *Id.* Of the

money stolen, $113,000 was taken from one client's trust account. *Id.* By then, the amount stolen was so large the lawyer was unable to pay it all back at once; as of the date of the disciplinary hearing, the lawyer still owed his client $30,000. *Id.*

The disciplinary board found the lawyer's conduct violated the Code of Professional Conduct and concluded a sanction was appropriate. *Id.* at 633-34, 660 A.2d at 302. When analyzing the question of what sanction to impose, the board concluded the lawyer's conduct was grossly negligent, and the presumptive sanction was suspension. *Id.* The Board found that a number of mitigating factors were present, and warranted reducing the sanction to a reprimand. *Id.* The Board found the lawyer grossly negligent because the notices from the IRS should have alerted the lawyer that there were financial irregularities, but the lawyer did nothing. *Id.* The mitigating factors in *Martin* included: absence of prior discipline; the absence of a dishonest or selfish motive; a timely, good faith effort to make restitution; cooperation with the disciplinary board; and remorse. *Id.* at 635, 660 A.2d at 302. There, as here, the only aggravating factor was substantial experience in the practice of law. *Id.*

Both the *Martin* case and the Respondent's case involve the lawyer's failure to have and follow a system of internal controls to safeguard client funds. There are two significant differences between the *Martin* case and Respondent's case. In *Martin* the employee embezzled $113,000 of client funds and the lawyer was not able to reimburse the client's account immediately. In Respondent's case, the employee took a much smaller amount ($2020.18), and Respondent was able to promptly cover the entire loss with his own funds. The second significant distinction between the *Martin* case and Respondent's case is that Respondent did not commit gross negligence. In *Martin* the lawyer was grossly negligent when he

failed to heed the early warning signs of financial impropriety. In *Martin* the lawyer received notice of an IRS debt, but did nothing to investigate the debt. In contrast, Respondent had one warning sign, being the notice from the bank that Respondent had insufficient funds in his operating account to make a transfer of funds. Once Respondent learned his account had insufficient funds, he immediately took action. By investigating the shortfall, Respondent discovered his employee had embezzled money from his operating account. The presence of gross negligence in *Martin* made reprimand, rather than admonition, the appropriate sanction. See also *In re Ponder,* 654 S.E.2d 533 (S.C. 2007) (attorney received public reprimand because he was grossly negligent in ignoring multiple warning signs that something was amiss with his client trust account). Here, clear and convincing evidence establishes that Respondent was simply negligent.

The facts of Respondent's case are somewhat similar to the facts of *In re Anonymous,* 876 N.E.2d 333 (Ind. 2007). In *In re Anonymous* the lawyer employed his wife as the accountant and bookkeeper for his two attorney practice. The lawyer was primarily responsible for the firm's finances, but his wife had control of the firm's trust account. The lawyer did not have a system of internal controls in place or supervise his wife's work. The lawyer's wife wrote unauthorized trust account checks, totaling $22,257, and forged the lawyer's (her husband's) signature on the checks. When the lawyer discovered his wife's actions and confronted her, she admitted the misappropriation. *Id.* at 333-34. The Indiana Supreme Court found the lawyer violated his duty to protect client property and failed to make reasonable efforts to ensure that the conduct of nonlawyer employees was compatible with the lawyer's own ethical obligations. The court found the lawyer was negligent in super-

648

vising his firm's trust account but, as mitigating factors, found he took immediate steps to rectify the situation and cooperated fully with the disciplinary commission. The court concluded that private admonition was the appropriate sanction. *Id.* at 335.

Based upon the substantial mitigating factors present in Respondent's case, the Hearing Panel concurs with the parties' recommended sanction, being an admonition by Disciplinary Counsel.

### III. ORDER

BASED UPON the foregoing findings of fact and conclusions of law, the parties request for admonition by Disciplinary Counsel for violation of Rules 5.3(a), 5.3(b) and 1.15 is GRANTED.